FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA   2012 MAY 23   AM 10: 24
HAMMOND DIVISION

FOR THE ... DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. |
| | ) | **2 12CV 207** |
| v. | ) | Judge |
| | ) | |
| BP PRODUCTS NORTH AMERICA INC. | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General

of the United States and through the undersigned attorneys, acting at the request of the

Administrator of the United States Environmental Protection Agency ("EPA"), files this

Complaint and alleges as follows:

## NATURE OF ACTION

1.       This is a civil action brought by the United States against BP Products North

America Inc. ("BP Products") pursuant to Sections 113(b) and 167 of the Clean Air Act

("CAA"), 42 U.S.C. §§ 7413(b) and 7477, and pursuant to Section 325 of the Emergency

Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11045, for violations of

the CAA and EPCRA at BP Products' petroleum refinery located at 2815 Indianapolis Boulevard

in Whiting, Indiana (the "Whiting Refinery"). The United States seeks the assessment of civil

penalties and appropriate injunctive relief based on these violations.

2.      The United States alleges that BP Products has violated and/or continues to violate the following Clean Air Act statutory and regulatory requirements that are applicable to the petroleum refining industry at its Whiting Refinery:

a.  the Prevention of Significant Deterioration ("PSD") Program contained in Part C of Title I of the CAA, 42 U.S.C. § 7470-7492, and the regulations promulgated thereunder at 40 C.F.R. § 52.21 ("PSD Regulations");

b.  the Non-attainment New Source Review Program contained in Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, and the regulations promulgated thereunder at 40 C.F.R. § 51.165, Part 51, Appendix S, and § 52.24 ("NSR Regulations");

c.  New Source Performance Standards ("NSPS") promulgated at 40 C.F.R. Part 60, Subparts A and J, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

d.  National Emission Standards for Hazardous Air Pollutants ("NESHAPs") promulgated at 40 C.F.R. Part 63, Subparts A, CC, and UUU, and the Benzene Waste Operations NESHAP, promulgated at 40 C.F.R. Part 61, subpart FF; and

e.  the Indiana state implementation plan ("SIP") which incorporates and/or implements the above-listed federal regulations.

3.      The United States also alleges that BP Products violated reporting requirements contained in EPCRA, 42 U.S.C. § 11004(a), at the Whiting Refinery.

## JURISDICTION, VENUE, AND AUTHORITY

4.      This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 7413(b), 28 U.S.C. §§ 1331, 1345, and 1355, and Section 325(b) and (c) of EPCRA, 42 U.S.C. § 11045(b) and (c).  This Court has personal jurisdiction over the parties.

5.      Venue is proper in this District pursuant to 42 U.S.C. § 7413(b), 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395(a), and Section 325(b)(3) and (c) of EPCRA, 42 U.S.C. § 11045(b)(3) and (c), because BP Products resides and is doing business within this judicial

district at its Whiting Refinery, because the actions giving rise to the violations alleged herein occurred in this judicial district, and BP Products may otherwise be found in this judicial district.

6.     Authority to bring this action is vested in the United States Department of Justice pursuant to Sections 113(b) and 305 of the CAA, 42 U.S.C. §§ 7413(b) and 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

## NOTICE TO STATE

7.     Notice of the commencement of this action was given to the State of Indiana at least thirty (30) days prior to the filing of this Complaint as required by Sections 113(a)(1) and 113(b) of the CAA, 42 U.S.C. §§ 7413(a)(1) and 7413(b).

## PARTIES

8.     Plaintiff is the United States of America, acting at the request of the United States Environmental Protection Agency ("EPA"), an agency of the United States.

9.     Defendant BP Products is and, at all times relevant to the Complaint, has been a corporation incorporated under the laws of the State of Maryland and doing business at the Whiting Refinery.

10.     BP Products is, and at all times relevant to the Complaint has been, the "owner" and "operator" of the Whiting Refinery, within the meaning of Sections 111(a) and 112(a) of the CAA, 42 U.S.C. §§ 7411(a) and 7412(a).

11.     BP Products is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), Section 329(7) of EPCRA, 42 U.S.C. §11049(7), and applicable federal and state regulations promulgated pursuant to these statutes.

3

## STATUTORY AND REGULATORY BACKGROUND

### A.      Clean Air Act Requirements

12.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

### 1.      National Ambient Air Quality Standards (NAAQS)

13.     CAA Section 108(a), 42 U.S.C. § 7408(a), requires the EPA to identify and prepare air quality criteria for each air pollutant, the emissions of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources.  For each such "criteria pollutant," Clean Air Act Section 109, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.

14.     Pursuant to Clean Air Act Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, EPA has identified nitrogen oxides (NOx), sulfur dioxide ($SO_2$), carbon monoxide (CO), particulate matter (PM), and ozone as criteria pollutants, and has promulgated primary and secondary NAAQS for them at 40 C.F.R. Part 50.

15.     Under Clean Air Act Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is deemed an "attainment" area.  An area that does not meet the NAAQS is deemed a "non-attainment" area.

An area that cannot be classified due to insufficient data is designated as "unclassifiable." Air quality designations for states are approved by EPA and located at 40 C.F.R. Part 81.

16.     Clean Air Act Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a state implementation plan ("SIP") that provides for the attainment and maintenance of the NAAQS within the state.

a.     Prevention of Significant Deterioration requirements

17.     Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in attainment areas. These provisions are referred to as the CAA's "PSD program."

18.     As set forth at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a "major emitting facility" in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any NAAQS.

19.     Clean Air Act Section 165(a), 42 U.S.C. § 7475(a), and the implementing PSD regulations prohibit the construction, major modification, and subsequent operation of a major emitting facility in an attainment area unless a PSD permit has first been issued that sets forth emission limitations and requirements for such facility that conform to the PSD requirements. 40 C.F.R. §§ 52.21(i) and (r), and 52.23.

20.     Among other things, a PSD Permit requires the owner and/or operator to install and operate the best available control technology ("BACT") (as that term is defined at 42 U.S.C. § 7479(3) and 40 C.F.R. § 52.21(b)(12)) at the facility for each pollutant that will have a significant net emissions increase, to conduct air quality modeling, and to analyze and

5

demonstrate that the construction or modification, taken together with other increases or decreases of air emissions, will not violate applicable air quality standards. 42 U.S.C. § 7475(a); 40 C.F.R. §§ 52.21(i) - (o).

21.    Section 161 of the CAA, 42 U.S.C. § 7471, requires SIPs to contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in attainment areas.

22.    A state may comply with CAA Sections 110(a) and 161, 42 U.S.C. §§ 7410(a) and 7471, either by having EPA delegate its authority to enforce the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations (which must be at least as stringent as those set forth at 40 C.F.R. § 51.166) approved by EPA as part of its SIP.

b.    Non-attainment New Source Review
(NNSR) requirements

23.    Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, directs States to include requirements in their SIPs that provide for making reasonable progress towards attainment of NAAQS in any non-attainment areas in the state.

24.    CAA Section 172(c)(5), 42 U.S.C. § 7502(c)(5), provides that SIPs shall require NNSR permits for the construction, major modification, and subsequent operation of major stationary sources anywhere in the non-attainment area, in accordance with CAA Section 173, 42 U.S.C. § 7503, in order to facilitate "reasonable further progress" towards attaining the NAAQS.

25.    CAA Section 173, 42 U.S.C. § 7503, requires that in order to obtain a NNSR permit the source must, among other things: (a) obtain federally enforceable emission offsets at least as great as the new or modified source's emissions; (b) comply with the lowest achievable emission rate ("LAER"), as defined in CAA Section 171(3), 42 U.S.C. § 7501(3); and (c)

analyze alternative sites, sizes, production processes, and environmental control techniques for the proposed source, and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

26.     A state may comply with Sections 172 and 173 of the CAA either by having EPA delegate its authority to enforce the federal NNSR regulations, or by having its own NNSR regulations (which must be at least as stringent as those set forth at 40 C.F.R. § 51.165) approved by EPA as part of its SIP.

### 2.     Flaring and New Source Performance Standards

27.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires the EPA to publish a list of categories of stationary sources that emit or may emit any air pollutant. The list must include any categories of sources that are determined to cause or significantly contribute to air pollution that may endanger public health or welfare. Petroleum refineries are listed as a category of such stationary sources. 42 U.S.C. § 7411(b)(1)(A).

28.     Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires the EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these source categories. "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source. 42 U.S.C. § 7411(b).

29.     Pursuant to Section 111(b) of the CAA, 42 U.S.C. § 7411(b), EPA has promulgated general New Source Performance Standards ("NSPS"), codified at 40 C.F.R. Part

7

60, Subpart A, §§ 60.1 - 60.19, that apply to owners or operators of any stationary source that contains an "affected facility" subject to regulation under 40 C.F.R. Part 60.

30.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA has promulgated NSPS for various industrial categories, including petroleum refineries. NSPS requirements for petroleum refineries are codified in 40 C.F.R. Part 60, Subparts J and Ja, §§ 60.100-60.109 and §§ 60.100a-60.109a.

31.     The provisions of 40 C.F.R. Part 60 Subpart J apply to specified "affected facilities," including, inter alia, fluid catalytic cracking unit ("FCCU") catalyst regenerator and fuel gas combustion devices, such as flares, that commenced construction or modification after June 11, 1973, and sulfur recovery plants with a capacity greater than twenty (20) long tons per day that commenced construction or modification after October 4, 1976. 40 C.F.R. § 60.100(a) and (b).

32.     The provisions of 40 C.F.R. Part 60 Subpart Ja apply to specified "affected facilities," including, inter alia, fuel gas combustion devices that commenced construction or modification after June 24, 2008, and FCCUs, fluid coking units, delayed coking units, process heaters, and sulfur recovery plants that commenced construction or modification after May 14, 2007. 40 C.F.R. § 60.100a(a) and (b).

33.     40 C.F.R. § 60.8(a) requires the owner or operator of facilities subject to 40 C.F.R. Subparts A and J to conduct performance test(s) of the affected facility and submit a written report of the performance test results to the EPA by specified deadlines.

34.     40 C.F.R. § 60.102(a) prohibits any FCCU catalyst regenerator from discharging into the atmosphere: (1) PM in excess of 1.0 kg/1000 kg (1.0 lb/1000 lb) of coke burn-off in the

catalyst regenerator, and (2) gases exhibiting greater than 30 percent opacity, except for one six-minute average opacity reading in any one hour period; except as provided for in 40 C.F.R. § 60.102(b).

35.     40 C.F.R. § 60.103(a) prohibits any catalytic cracking unit catalyst regenerator from discharging into the atmosphere any gases that contain CO in excess of 500 ppm by volume (dry basis).

36.     40 C.F.R. § 60.104(a)(1) prohibits the burning in any fuel gas combustion device of any fuel gas that contains hydrogen sulfide ("$H_2S$") in excess of 230 milligrams per dry standard cubic meter, or 0.10 grains per dry standard cubic foot.

37.     40 C.F.R. § 60.104(a)(2) prohibits sulfur recovery plants subject to 40 C.F.R. Part 60, Subpart J with reduction control systems followed by incineration from discharging in excess of 250 ppm by volume (dry basis) of $SO_2$ at zero percent excess air.  40 C.F.R. § 60.104(a)(2) prohibits sulfur recovery plants subject to 40 C.F.R. Part 60, Subpart J with reduction control systems not followed by incineration from discharging in excess of 300 ppm by volume of reduced sulfur compounds and in excess of 10 ppm by volume of H2S, each calculated as ppm $SO_2$ by volume (dry basis) at zero percent excess air.

38.     Pursuant to 40 C.F.R. § 60.104(b), the owner or operator of each affected FCCU catalyst regenerator shall comply with one of the conditions set forth in 40 C.F.R. § 60.104(b)(1), (2), or (3).

39.     Pursuant to 40 C.F.R. § 60.105(a)(3), the owner or operator of fuel gas combustion devices subject to 40 C.F.R. § 60.104(a)(1) must install, calibrate, maintain, and operate a continuous monitoring system to record the concentration by volume of $SO_2$ emissions

9

into the atmosphere.  The continuous monitor shall include an oxygen monitor for correcting the data for excess air.

40.    As an alternative to 40 C.F.R. § 60.105(a)(3), pursuant to 40 C.F.R. § 60.105(a)(4), the owner or operator of fuel gas combustion devices subject to 40 C.F.R. § 60.104(a)(1) may install, calibrate, maintain, and operate an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in fuel gases before being burned in an affected fuel gas combustion device.

41.    Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. Part 60 prohibits the operation of any new source in violation of an NSPS applicable to such source.

### 3.    Flare Efficiency and Oversteaming

42.    Flares are mechanical devices that combust gas into the open air.  Flares use a specially designed burner tip, auxiliary fuel, and may use steam or air as an assist medium to promote mixing with the goal of nearly complete destruction of VOCs, hazardous air pollutants ("HAPs"), SO2, and H2S.  A flare's ability to destroy organic and other material sent to it, and thus prevent such material from being emitted into the air, is referred to as combustion efficiency.

43.    Typically flares are designed to combust at least 98% of the organic material sent to it.  Actual combustion efficiency depends on, among other things, the temperature in the combustion zone of the flare.  Combustion zone temperature is influenced by several factors.

44.    Temperature in the combustion zone is influenced by, the combustability of the gases sent to the flare, as well as the amount of heat the gases will give off when burned.

Different gases give off different amounts of heat when burned. This amount of heat, called "heat value," is measured in British Thermal Units per standard cubic foot of gas.

45.     Not adjusting a flare's operation to account for variations in the heating value of gases sent to it for combustion can decrease the flare's combustion efficiency.

46.      The amount of steam added to a flare also affects combustion zone temperature, and therefore, combustion efficiency. In steam-assisted flares, steam is injected into the combustion zone to promote "turbulence." Good turbulence ensures that all the material sent to the flare (air, vent gas, and auxiliary fuel) is well-mixed and combusts efficiently.

47.     However, injecting too much steam will "quench" the flare and inhibit efficient combustion by lowering the combustion zone temperature. Accordingly, an appropriate ratio of steam-to-vent gas must be maintained in order to assure sufficient destruction of VOCs and other pollutants contained in the gases that are sent to a flare.

48.     A well-operated flare injects enough steam to prevent the flare from smoking (smoke indicates poor combustion efficiency), but not so much steam that the flame is quenched-again causing poor combustion efficiency.

49.     According to research by the America Petroleum Institute (API), once the steam-to-vent gas ratio for a flare is exceeded by at least a multiple of seven (7) or more, it is likely that the flare is not achieving 98% combustion efficiency. Flares operating in such a manner are not practicing good air pollution control because of the probability that poor combustion efficiency is occurring.

50.     To ensure proper combustion efficiency, flares that are required or allowed to be used as a control device for complying with the CAA's NSPS and NESHAPs at certain affected

11

facilities must meet certain compliance parameters for their proper operation and maintenance. "Flares shall be designed for and operated with no visible emissions." 40 C.F.R. §§ 60.18(c)(1) and 63.11(b)(4).

51.    In addition, the NSPS and NESHAP contain overarching requirements that owners and operators of flares "shall monitor these control devices to ensure that they are operated and maintained in conformance with their designs." 40 C.F.R. §§ 60.18(d) and 63.11(b)(1). 40 C.F.R. §§ 60.11(d) and 63.6(e) require that at all times, including periods of startup, shutdown, and malfunction, owners and operators of NSPS or NESHAP affected facilities shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.

52.    40 C.F.R. Part 60, Subpart VV (Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry) includes requirements for flares that are used to control equipment leaks at affected facilities. 40 C.F.R. § 60.482-10(d) provides that flares used to comply with Subpart VV must comply with 40 C.F.R. § 60.18.

53.    40 C.F.R. Part 60, Subpart GGG (Standards of Performance for Equipment Leaks of VOC in Petroleum Refineries) also includes requirements for flares that are used to control equipment leaks of VOCs at affected facilities in the petroleum refining industry. Pursuant to 40 C.F.R. § 60.592(a), owners and operators of affected facilities subject to Subpart GGG are directed to comply with the requirements of 40 C.F.R. Part 60, Subpart VV, including 40 C.F.R. § 60.482-10. In addition, sources subject to Subpart GGG must comply with 40 C.F.R. § 60.11(d).

12

54.     40 C.F.R. Part 63, Subpart CC (National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries) (known as the "Refinery MACT I") also includes requirements for flares that are used to control emissions at affected facilities in the petroleum refining industry.  Pursuant to 40 C.F.R. Part CC, Table 6, 40 C.F.R. § 63.6(e) applies to affected sources under Subpart CC (except for "Group 2 emission points") and 40 C.F.R. § 63.11(b) applies to all affected sources regulated by Subpart CC.

55.     40 C.F.R. Part 63, Subpart UUU (National Emission Standards for Hazardous Air Pollutants for Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units) (known as the "Refinery MACT II") also includes requirements for flares that are used to control emissions from vents at the specified affected process units in the petroleum refining industry.  Pursuant to 40 C.F.R. § 63.1566(a)(1)(i), and pursuant to Tables 15 and 44 to Subpart UUU, flares used to control vent emissions of total organic compounds (TOC) at affected sources under Subpart UUU must meet the requirements of 40 C.F.R. §§ 63.6(e)(1)-(2) and 63.11(b).

56.     BP Products owns and operates flares at the Whiting Refinery, including the FCU Flare, the UIU flare, the Alky flare, the DDU flare, and the VRU flare.  These flares are all steam-assisted flares, and are all subject to NSPS Subparts A and J, and Subpart A of 40 C.F.R. Part 63.

### 4.     Benzene Waste NESHAP

57.     CAA Section 112 requires EPA to establish emission standards for HAPs, 42 U.S.C. § 7412.  Benzene is listed as a HAP under CAA Section 112(b), 42 U.S.C. § 7412(b). Benzene is a naturally occurring constituent of petroleum product and petroleum wastes.  It is a

13

known carcinogen and is highly volatile. Benzene emissions can be detected anywhere in a refinery where petroleum product or waste materials are exposed to the ambient air.

58.     In March 1990, EPA promulgated national emission standards applicable to benzene-containing wastes. The benzene waste regulations are set forth at 40 C.F.R. Part 61, Subpart FF, (National Emission Standard for Benzene Waste Operations) (the "Benzene Waste NESHAP").

59.     Pursuant to the Benzene Waste NESHAP, refineries are required to tabulate the total annual benzene ("TAB") content in their wastewater. If the TAB is over 10 megagrams, the refinery is required to elect a control option that will require the control of all waste streams, or control of certain select waste streams. 40 C.F.R. § 61.342.

60.     Under the control option known as the "6 Mg Option," a facility must control all benzene-containing wastes except for up to 6 Mg of aqueous benzene-containing wastes. 40 C.F.R. § 61.342(e).

61.     40 C.F.R. § 61.05(c) prohibits any owner or operator subject to the Benzene Waste NESHAP from operating an existing regulated source in violation of its requirements.

### 5.     CAA Title V Program

62.     Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and any source required to have a PSD or NNSR Permit. 42 U.S.C. § 7661a(a). This operating permit program ensures that all "applicable requirements" for compliance with the CAA, including SIP requirements, are collected in one place. 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a).

14

63.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b) provide that, after the effective date of any permit program approved or promulgated under Title V of the CAA, no source subject to Title V may operate except in compliance with a Title V permit.

64.     40 C.F.R. § 70.1(b) provides that all sources subject to the Part 70 regulations shall have a permit to operate that assures compliance by the source with all applicable requirements, as defined in 40 C.F.R. § 70.2.

65.     Pursuant to Clean Air Act Section 502(b), 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. These regulations are codified at 40 C.F.R. Part 70.

66.     Under Title V, any owner or operator of a source subject to the Title V program is required to submit a timely and complete permit application that contains information sufficient to determine the applicability of any CAA requirements, certifies compliance with all applicable requirements, and contains a compliance plan for all applicable requirements for which the source is not in compliance. 42 U.S.C. § 7661b(b)-(c) and 40 C.F.R. §§ 70.5(a) and (c).

67.     Under Title V, any applicant who fails to submit any relevant fact or who has submitted incorrect information in a permit application is required to promptly submit such supplementary facts or corrected information upon becoming aware of such failure or incorrect submittal. 40 C.F.R. § 70.5(b).

68.     Pursuant to Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a), and 40 C.F.R.

15

§§ 70.1(b) and 70.7(b), it is unlawful for any person and certain major sources to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V that assures compliance with "all applicable requirements" of the Clean Air Act.

### 6.    Indiana SIP

69.    The Indiana SIP was originally approved by the Administrator on May 31, 1972 (37 Fed. Reg. 10862 (1972)).

70.    On or around February 2005, the portion of Lake County, Indiana where the Whiting Refinery is located was designated as non-attainment for $SO_2$, the annual $PM_{2.5}$ NAAQS, and the 8-hour ozone NAAQS.  This designation is codified at 40 C.F.R. § 81.315.

71.    Indiana Air Pollution Control Board Rule ("Indiana Rule") 326 IAC 8-4-8 sets forth standards which regulate volatile organic compound leaks ("fugitive emissions") from components within a petroleum refinery.  This rule was approved as part of the federally enforceable SIP for the State of Indiana on March 6, 1992, and became effective on April 6, 1992 (57 Fed. Reg. 8086 (1992)).

72.    Indiana's Title V program was approved by EPA, effective as of November 4, 2001.  66 Fed. Reg. 62,969 (Dec. 4, 2001).

### 7.    Enforcement of the CAA

73.    CAA Section 113(b), 42 U.S.C. § 7413(b), as amended by 28 U.S.C. § 2461 and 31 U.S.C. § 3701, provides that, whenever a person violates any requirement or prohibition of Subchapters I and V of the CAA (42 U.S.C. §§ 7401-7515 and 42 U.S.C. §§ 7661 - 7661f), the Administrator of EPA shall, as appropriate, in the case of a person which is the owner or

16

operator of a major stationary source, and may, in the case of any other person, commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

**B.    EPCRA Requirements**

74.    The purpose of EPCRA is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases. Emergency Planing and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (Nov. 17, 1986).

75.    To achieve this end, EPCRA mandates notification requirements on industrial and commercial facilities and mandates that state emergency response commissions ("SERCs") and local emergency plannng committees ("LEPCs") be created. EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release. The LEPCs are charged with developing emergency response plans based on the information provided by facilities. 42 US.C. §§ 11001-11003.

76.    Section 302(a) of EPCRA, 42 US.C. § 11002(a), requires the EP A to publish a list of extremely hazardous substances which, when released into the environment, may present a substantial danger to public health or welfare or the environment. EPA is also required to promulgate regulations establishing the quantity of hazardous substance, the release of which shall be required to be reported under Sections 304(b) and 304(c) of EPCRA, 42 U.S.C. §§

17

11004(b) and (c), (the "Reportable Quantity" or "RQ"). The list of RQs for EPCRA hazardous substances is codified at 40 C.F.R. Part 302.

77.     Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b), and the regulations found at 40 C.F.R. § 355.40, requires owners and operators of EPCRA-regulated facilities to immediately notify the SERC and LEPC of any areas likely to be affected by a release of an extremely hazardous substance or CERCLA hazardous substance in a quantity equal to or greater than the RQ.

78.     Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), requires that, as soon as practicable after a release which requires notice under Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), the owner or operator shall provide a written follow-up emergency notice providing certain specified additional information.

79.     Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and 61 Fed. Reg. 69369, provide that, for violations occurring between January 30, 1997 and March 30, 2004, any person who violates any requirement of EPCRA Section 304, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties of up to $27,500 per day for each day the violation continues, and in an amount of up to $82,500 per day for each day that any second or subsequent violation continues. For violations occurring between March 30, 2004 and January 12, 2009, civil penalties are authorized of up to $32,500 per day for each day the violation continues, and up to $97,500 per day for each day that any second or subsequent violation continues. For violations occurring after January 12, 2009, civil penalties are authorized of up to $37,500 per day for each day the violation continues, and up to $107,500 per day for each day that any second or subsequent violation continues.

## GENERAL ALLEGATIONS

80.     At all times relevant herein, BP Products has owned and operated the Whiting Refinery, a petroleum refinery within the meaning of 42 U.S.C. §§ 7479(1), 7612(a)(9), and 7661(2), and within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(a) and 40 C.F.R. § 70.2.

81.     At all times relevant herein, the Whiting Refinery has emitted or had the potential to emit at least 100 TPY of NOx, $SO_2$, CO, PM (including $PM_{10}$ and $PM_{2.5}$), and VOCs.

82.     At all times relevant herein, the Whiting Refinery has been a "major emitting facility," as defined by CAA Section 169(1), 42 U.S.C. § 7479(1), a "major stationary source," as defined by 40 C.F.R. § 52.21(b)(1)(i)(a), and a "major source," as defined by 42 U.S.C. § 7412(a)(1), 42 U.S.C. § 7661(2), and 40 C.F.R. § 70.2.

83.     At all times relevant herein, the Whiting Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 60, Subparts A, J, and Ja.

84.     At all times relevant herein, the Whiting Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 60, Subpart VV, Subpart GGG.

85.     At all times relevant herein, the Whiting Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 63, Subparts CC and UUU.

86.     At all times relevant herein, the Whiting Refinery has been subject to the Title V permitting requirements contained in 40 C.F.R. Part 70 and the Indiana SIP.

## FIRST CLAIM FOR RELIEF

### (CAA - PSD/NNSR Violations at Fluidized Catalytic Cracking Unit 500)

87.     Paragraphs 1 through 86 are re-alleged and incorporated by reference as if fully set forth herein.

88.     At all times relevant herein, BP Products has owned and operated a Fluidized Catalytic Cracking Unit at the Whiting Refinery, referred to as FCU 500. FCU 500 is an existing major stationary source of criteria air pollutants at the Whiting Refinery.

89.     On or around February 2005, BP Products commenced construction of a "major modification" of FCU 500 within the meaning of 40 C.F.R. § 52.21(b)(2). See 40 C.F.R. § 52.21(b)(2)(i) (defining "major modification" as any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the CAA). This major modification included physical changes such as combustion air improvements, a reactor stripper revamp, a slurry system reliability upgrade, and a feed nozzle replacement.

90.     The "major modification" of FCU 500 allowed BP Products to increase the feed rate and/or convert up to the maximum oxygen limits of FCU 500, which resulted in a significant net emissions increase of: NOx, $SO_2$, PM, $PM_{10}$, VOCs, and CO. See 40 C.F.R.§ 52.21(b)(23)(i) (defining "significant" in reference to a net emissions increase or the potential of a source to emit any of the following criteria pollutants at an emissions rate that would equal or exceed any of the following: for ozone, 40 tons per year of VOCs; for CO, 100 tons per year; for NOx, 40 tons per year; for $SO_2$, 100 tons per year; for PM, 25 tons per year; and for $PM_{10}$, 15 tons per year).

91.     On or around February 2005, the portion of Lake County, Indiana where the Whiting Refinery is located was designated as non-attainment for $SO_2$, the annual $PM_{2.5}$ NAAQS, and the 8-hour ozone NAAQS. This designation is codified at 40 C.F.R. § 81.315.

92.     Because a NOx waiver did not apply to the ozone standard for which Lake County was non-attainment and NOx is a pre-cursor for ozone, the non-attainment provisions of the Indiana SIP apply to major modifications with significant NOx emission increases.

93.     Because NOx also contributes to ambient levels of $NO_2$, the PSD provisions of the Indiana SIP also apply to major modifications with significant NOx emissions and increases.

94.     Since the major modification of FCU 500, BP Products has been in violation of Section 165(a) of the CAA, 42 U.S.C. § 7475(a), 40 C.F.R. §§ 52.21 and 52.24, and the Indiana SIP Rule 326 IAC 2-1-03(a) and (c), and SIP Rules 326 IAC 2-2 and 326 IAC 2-3, by, among other things, 1) failing to undergo PSD/NNSR review for FCU 500, 2) failing to obtain necessary construction and operating permits, 3) failing to install control technology consistent with the best available control technology or the lowest achievable emission rate for the pollutants for which a significant net emissions increase occurred, and 4) failing to offset emissions of pollutants for which Lake County, Indiana was designated nonattainment at the time construction commenced on the major modification performed to FCU 500.

95.     Unless restrained by an Order of the Court, these violations of the Clean Air Act and its implementing regulations will continue.

96.     As a result of its violations, pursuant to CAA Sections 113(b) and 167, 42 U.S.C. §§ 7413(b) and 7477, as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997

21

and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## SECOND CLAIM FOR RELIEF

### (CAA - PSD/NNSR Violations – OCC/WRMP Project)

97.     The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

98.     As alleged above, BP Products made major modifications to the FCU 500, a major source at the Whiting Refinery.

99.     Upon information and belief, the major modifications to the FCU 500 allowed BP Products to commence construction of an expansion project at the Whiting Refinery known as "Operation Canadian Crude" ("OCC") and the "Whiting Refinery Modernization Project" ("WRMP").

100.    Upon information and belief, in its May 1, 2008 Part 70 Significant Source Modification permit (Permit No. T089-6741-00453, as modified by Significant Permit Modifications 089-24068-00453 and 089-24410-00453), BP Products failed to properly account for the contemporaneous increases and decreases in emissions of $SO_2$, NOx, VOCs, CO, PM (including $PM_{10}$ and $PM_{2.5}$), hydrogen sulfide, reduced sulfur compounds, and Total Reduced Sulfur occurring as a result of the OCC/WRMP projects. *See* 40 C.F.R. § 52.21(b)(3). Since the major modification of FCU 500 and commencing construction of the OCC/WRMP projects, BP Products has been in violation of Sections 165(a)(1)-(2) of the CAA, 42 U.S.C.

§ 7475(a)(1)-(2), 40 C.F.R. § 52.21(a)(2)(iii), and the Indiana SIP Rules 326 IAC 2-2-2(c) and 2-3-3.

101.    Unless restrained by an Order of the Court, these violations of the Clean Air Act and its implementing regulations will continue.

102.    As a result of its violations, pursuant to CAA Sections 113(b) and 167, 42 U.S.C. §§ 7413(b) and 7477, as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

### THIRD CLAIM FOR RELIEF

#### (CAA - Failure to Continuously Monitor and
#### Conduct Performance Testing at Fuel Gas Combustion Devices)

103.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

104.    In October of 1988, BP Products increased the capacity of the UIU flare (a fuel gas combustion device) at the Whiting Refinery, by increasing the size of the UIU flare's knockout drum.

105.    In October of 1989, BP Products increased the capacity of the Alky flare (a fuel gas combustion device) at the Whiting Refinery, by increasing the size of the Alky flare's knockout drum.

106.    In 1993, BP Products installed the DDU flare (a fuel gas combustion device) at the Whiting Refinery.

23

107.    In 1986, BP Products installed the LPG flare (a fuel gas combustion device) at the Whiting Refinery.

108.    Each of these projects constituted modifications or the construction of a new source within the meaning of 40 C.F.R. Part 60, Subparts A and J (the NSPS for Petroleum Refineries), and therefore, triggered the applicability of Subparts A and J to the UIU, Alky, DDU, and LPG flares.

109.    Since triggering the requirements of Subparts A and J at the UIU and Alky flares, BP Products has failed to comply with the monitoring requirements of 40 C.F.R. § 60.105(a)(3), or alternatively, the requirements of 40 C.F.R. § 60.105(a)(4) at these affected facilities.

110.    Since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the UIU and Alky flares, BP Products has failed to comply with the performance testing requirements of 40 C.F.R. § 60.8(a) at these affected facilities.

111.    Since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the DDU flare and until January 15, 2005, BP Products failed to comply with the monitoring requirements of 40 C.F.R. § 60.105(a)(3), or alternatively, the requirements of 40 C.F.R. § 60.105(a)(4) at this affected facility.

112.    Since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the DDU flare and until January 15, 2005, BP Products failed to comply with the performance testing requirements of 40 C.F.R. § 60.8(a) at this affected facility.

113.    Since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the LPG flare and until January 25, 2005, BP Products failed to comply with the monitoring requirements of 40 C.F.R. § 60.105(a)(3), or alternatively, the requirements of 40 C.F.R.

24

§ 60.105(a)(4) at this affected facility.

114.    Since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the LPG flare, BP Products has failed to comply with the performance testing requirements of 40 C.F.R. § 60.8(a) at this affected facility.

115.    Unless restrained by an Order of the Court, these violations of the Clean Air Act and its implementing regulations will continue.

116.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## FOURTH CLAIM FOR RELIEF

### (CAA - Failure to Continuously Monitor at Other Affected Facilities)

117.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

118.    At all relevant times herein, BP Products has owned and operated a Catalytic Feed Hydrotreater Unit, a Catalytic Refining Unit, a Catalytic Reforming Unit ("Ultraformer 4"), and a Claus Sulfur Recovery Plant, which includes a Sulfur Recovery Plant Mix Drum, at the Whiting Refinery.

25

119.     At all relevant times herein, the Catalytic Feed Hydrotreater Unit, Catalytic Refining Unit, Ultraformer 4, Sulfur Recovery Plant, and Sulfur Recovery Plant Mix Drum have been "affected facilities" and subject to the requirements of 40 C.F.R. Part 60, Subparts A and J.

120.     On numerous occasions since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the Catalytic Feed Hydrotreater Unit, Catalytic Refining Unit, Ultraformer 4, and Sulfur Recovery Plant Mix Drum, BP Products failed to comply with the monitoring requirements of 40 C.F.R. § 60.105(a)(4) at these facilities.

121.     On numerous occasions since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the Sulfur Recovery Plant, BP Products failed to comply with the monitoring requirements of 40 C.F.R. § 60.105(a)(5) (when the Sulfur Recovery Plant was controlled with an oxidation system or reduction system followed by oxidation) and 40 C.F.R. § 60.105(a)(6) (when the Sulfur Recovery Plant was controlled with a reduction system that was not followed by oxidation).

122.     Unless restrained by an Order of the Court, these violations of the Clean Air Act and its implementing regulations will continue.

123.     As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

26

## FIFTH CLAIM FOR RELIEF

### (CAA - Failure to Comply with Subpart J Emissions Limits)

124.    The allegations in paragraphs 1 through 86 and 118-19 are hereby re-alleged and incorporated by reference as if fully set forth herein.

125.    On numerous occasions since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the Catalytic Feed Hydrotreater Unit, Catalytic Refining Unit, Ultraformer 4, and Sulfur Recovery Plant Mix Drum, BP Products failed to comply with the emissions limit for $H_2S$ in 40 C.F.R. § 60.104(a)(1) at these facilities.

126.    On numerous occasions since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the Sulfur Recovery Plant, BP Products failed to comply with the emissions limit for $SO_2$ in 40 C.F.R. § 60.104(a)(2)(i) when the Sulfur Recovery Plant was controlled with an oxidation system or reduction system followed by oxidation.

127.    On numerous occasions since triggering the requirements of 40 C.F.R. Part 60, Subparts A and J at the Sulfur Recovery Plant, BP Products failed to comply with the emissions limit for reduced sulfur compounds in 40 C.F.R. § 60.104(a)(2)(ii) when the Sulfur Recovery Plant was controlled with a reduction system that was not followed by oxidation.

128.    In addition, on October 4, 2006 and between October 30, 2006 and November 7, 2006, BP Products failed to comply with the emissions limit for $SO_2$ in 40 C.F.R. § 60.104(a)(2)(i) when emissions from the Sulfur Recovery Plant were routed directly to the standby incinerator and not controlled in either of the tail gas units at the Whiting Refinery. These exceedances also violated the requirements of 326 IAC 7-4.1-3(a)(17).

27

129.    Unless restrained by an Order of the Court, these violations of the Clean Air Act and its implementing regulations will continue.

130.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## SIXTH CLAIM FOR RELIEF

### (CAA - Failure to Control Emissions from Sulfur Pits at the Sulfur Recovery Plant)

131.    The allegations in paragraphs 1 through 86 and 118-19 are hereby re-alleged and incorporated by reference as if fully set forth herein.

132.    At all times relevant herein, BP Products has owned and operated sulfur pits that were part of the Sulfur Recovery Plant at the Whiting Refinery.

133.    Pursuant to condition D.3.6 of permit SSM 089-13846-00003, as amended by AA 089-15525-00003, BP Products was required to treat, monitor, and include all emissions from the sulfur pits at the Whiting Refinery as part of the emissions from the Sulfur Recovery Plant.

134.    Between October 30, 2006 and November 16, 2006, BP Products failed to control emissions from the sulfur pits at the Whiting Refinery as part of the emissions from the Sulfur Recovery Plant. These failures resulted in a release of $H_2S$ from the sulfur pits and constituted a violation of condition D.3.6 of permit SSM 089-13846-00003, as amended by AA 089-15525-00003.

28

135.     BP Products' failure to treat, monitor, and include all emissions from the sulfur pits at the Whiting Refinery as part of the emissions from the Sulfur Recovery Plant also constituted a violation of 40 C.F.R. § 60.11(d).

136.     As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## SEVENTH CLAIM FOR RELIEF

### (CAA - Failure to Conduct Performance Testing and Submit Results of the HCl Emissions from Ultraformers 3 and 4)

137.     The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

138.     At all times relevant herein and after the compliance date of the Refinery MACT II, BP Products has owned and operated two cyclic catalytic reforming units within the meaning of 40 C.F.R. § 63.1562(b) (referred to as Ultraformer 3 and Ultraformer 4).

139.     At all times relevant herein, Ultraformers 3 and 4 were subject to a 10 ppmv HCl outlet concentration limit (an inorganic HAP emission limit), corrected to 3 percent oxygen pursuant to Table 22 of Refinery MACT II and 40 C.F.R §63.1567(a)(1).

140.     Pursuant to 40 C.F.R. §§ 63.1563 and 63.1571, BP Products was required to conduct performance tests at Ultraformers 3 and 4 and report the results to EPA by no later than 150 days after April 11, 2005.

141.    Pursuant to Table 25 § 1(e)(1) of the Refinery MACT II, the performance test required by 40 C.F.R. § 63.1571 must be conducted during the coke burn-off and catalyst rejuvenation cycles.

142.    BP Products failed to conduct performance testing and submit the results of the HCl emissions from Ultraformers 3 and 4 during both the coke burn-off and catalyst rejuvenation cycles within 150 days of April 11, 2005, in violation of 40 C.F.R. § 63.1571.

143.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## EIGHTH CLAIM FOR RELIEF

### (CAA - Benzene Waste NESHAP)

144.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

145.    As the owner and operator of the Whiting Refinery, BP Products is, and at all relevant times has been, subject to the Benzene Waste NESHAP pursuant to 40 C.F.R. § 61.340(a).

146.    At all times relevant herein, the Whiting Refinery has been a "petroleum refinery" within the meaning of 40 C.F.R. § 61.341.

147.    At all times relevant herein, the Whiting Refinery has had a total annual benzene quantity greater than or equal to 10 Mg/yr, as determined by the procedures outlined in 40 C.F.R. § 61.342(a). Accordingly, BP Products has been required to manage and treat wastes at the Whiting Refinery in accordance with 40 C.F.R. § 61.342(c), (d), or (e).

148.    At all times relevant herein, BP Products has elected to comply with the "6 Mg Option," found at 40 C.F.R. § 61.342(e), at the Whiting Refinery.

149.    Pursuant to 40 C.F.R. § 61.342(e), the benzene quantity for uncontrolled benzene-containing wastes must be equal to or less than 6.0 megagrams per year.

150.    From 2004 through 2008, BP Products had an uncontrolled benzene quantity in excess of the 6 Mg Option, in violation of 40 C.F.R. § 61.342(e)(2) and 40 C.F.R. § 61.05(c).

151.    Unless restrained by an order of the Court, these violations of the Act and the implementing regulations will continue.

152.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## NINTH CLAIM FOR RELIEF

### (Failure to Operate Flares Consistent with Good Air Pollution Control Practices – Flaring Efficiency/Oversteaming)

153.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

31

154. At all times relevant herein, BP Products has owned and operated the following fuel gas combustions devices at the Whiting Refinery: the FCU flare, Alky flare, UIU flare, DDU flare, and VRU flare. These flares are steam-assisted.

155. At all times relevant herein, BP Products has used the FCU flare, Alky flare, UIU flare, DDU flare, and VRU flare to control emissions from process units at the Whiting Refinery, including emissions resulting from malfunctions and pressure relief episodes.

156. At all times relevant herein, the FCU flare has been used by BP Products to control emissions from FCU 600, a process unit at the Whiting Refinery that is subject to the requirements of 40 C.F.R. Part 63, Subpart CC and 40 C.F.R. Part 63, Subpart UUU.

157. At all times relevant herein, the UIU flare has been used by BP Products to control emissions from process units at the Whiting Refinery, including the Isomerization Unit, Ultraformer No. 3, No. 2 Treatment Plant, and Catalytic Refining Unit. These process units are subject to the requirements of 40 C.F.R. Part 63, Subpart CC and 40 C.F.R. Part 63, Subpart UUU. In addition, the Catalytic Refining Unit is subject to the requirements of 40 C.F.R. Part 60, Subpart GGG.

158. At all times relevant herein, the Alky flare has been used by BP Products to control emissions from process units at the Whiting Refinery, including the Propylene Concentration Unit and the Alkylation unit. Both of these process units are subject to the requirements of 40 C.F.R. Part 63, Subpart CC.

159. At all times relevant herein, the DDU flare has been used by BP Products to control emissions from process units at the Whiting Refinery, including the Distillate

32

Desulfurizer Unit, the Hydrogen Unit, and the Coker. These process units are subject to the requirements of 40 C.F.R. Part 63, Subpart CC and 40 C.F.R. Part 60, Subpart GGG.

160.   In addition, at all times relevant herein, the DDU flare has been used by BP Products to control emissions from the Distillate Hydrotreating Unit, a process unit at the Whiting Refinery that is subject to the requirements of 40 C.F.R. Part 63, Subpart CC.

161.   At all times relevant herein, the VRU flare has been used by BP Products to control emissions from process units at the Whiting Refinery, including the FCU 500, which is subject to the requirements of 40 C.F.R. Part 63, Subpart CC and 40 C.F.R. Part 60, Subpart GGG, and the Vapor Recovery Units, which are subject to the requirements of 40 C.F.R. Part 63, Subpart CC.

162.   Based on the process units these flares have been used to control emissions from, at all times relevant herein, the FCU flare, Alky flare, UIU flare, DDU flare, and VRU flare have been subject to the requirements of 40 C.F.R. §§ 60.11(d), 60.18(c)-(d), 60.482-10(d), 60.592(a), 63.6(e)(1)(i), 63.11(b), and 63.1566(a)(1)(i), including Tables 15 and 44 to Subpart UUU.

163.   Manufacturers' instructions for the FCU flare, the UIU flare, the Alky flare, and the DDU flare establish that the steam-to-vent gas ratio at these flares should be approximately 0.3 - 0.4 lb steam/lb vent gas at the flares' design conditions in order ensure proper combustion efficiency.

164.   API guidance also recommends that the amount of steam required for proper combustion efficiency at a steam-assisted flare "is normally in the range of 0.25 to 1.0 [lb steam/lb vent gas]," depending on the compound combusted.

33

165.     An EPA study has also concluded that "steam-to-relief gas ratios ranging from 0.4 to 1.5 yield the best combustion efficiencies." The study also states that steam-to-vent gas ratios above 3.07, "are regarded as being higher than those that would represent good engineering practice."

166.     Since at least July 2006, BP Products has operated the FCU, UIU, DDU, Alky, and VRU flares in excess of the steam-to-vent gas ratio required by the flare manufacturer's instructions and API guidance on multiple occasions. In some cases, BP Products has operated these flares at a steam-to-vent gas ratio in excess of 10 lb/lb, measured as three-hour averages.

167.     BP Products' operation of the FCU, UIU, DDU, Alky, and VRU flares at steam-to-vent gas ratios greater than required by manufacturer's instructions and API guidance resulted in excess steam being added to these flares. Upon information and belief, these exceedances reduced the combustion efficiency of the flares and increased emissions of VOCs and/or HAPs from these flares.

168.     BP Products' operation of the FCU, UIU, DDU, Alky, and VRU flares at steam-to-vent gas ratios greater than required by manufacturer's instructions and API guidance constitute violations, with respect to VOCs, of the good air pollution control practices provisions and the flare operation and maintenance provisions of 40 C.F.R. §§ 60.11(d), 60.18(d), 63.6(e)(1)(i), and 63.11(b), as well as violations of 40 C.F.R. §§ 60.592(a), 63.643(a)(1), 63.648(a), and 63.1566(a)(1)(i), including Tables 15 and 44 to Subpart UUU.

169.     Unless restrained by an Order of the Court, these violations of the CAA and the implementing regulations will continue.

170.     As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C.

§ 743(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## TENTH CLAIM FOR RELIEF

### (CAA –Subpart J, CEMS Downtime)

171.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

172.    BP Products owns and operates continuous emissions monitoring systems (CEMS) at various process units at the Whiting Refinery that are subject to the requirements of 40 C.F.R. Subparts A and J.

173.    On numerous occasions between 2002-2007, BP Products failed to comply with the requirement in 40 C.F.R. § 60.13(e) to continuously operate its CEMS units, except for periods of system breakdowns, repairs, calibration checks, and zero and span adjustments required by 40 C.F.R. § 60.13(d), at the NOx and $SO_2$ CEMS at the FCU 500, NOx CEMS at the FCU 600, Total Reduced Sulfur (TRS) CEMS at Tail Gas Unit off-gas stream, $H_2S$ CEMS at the Ultraformer 4, and, upon information and belief, the $H_2S$ CEMS at the DDU flare.

174.    BP Products' actions constitute violations of 40 C.F.R. § 60.13(e).

175.    Unless restrained by an Order of the Court, these violations of the CAA and the implementing regulations will continue.

176.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C.

35

§ 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

**ELEVENTH CLAIM FOR RELIEF**

**(CAA - Title V Permit Program Violations)**

177.    The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

178.    At all times relevant herein, BP Products has been subject to the requirements of Title V of the CAA at the Whiting Refinery.

179.    As alleged above, BP Products made major modifications to the FCU 500, a major source at the Whiting Refinery, and triggered Title V's requirements to, among other things, obtain proper PSD/NNSR permits establishing emissions limitations that meet BACT/LAER and to operate in compliance with BACT/LAER.

180.    Since the major modifications to the FCU 500 and commencing construction of the OCC/WRMP projects, BP Products has been operating the Whiting Refinery without complying with these applicable requirements and without applying for or receiving a complete and adequate Title V operating permit from IDEM containing all applicable requirements.

181.    BP Products' failure to submit a timely and complete Title V permit application to IDEM that identifies all applicable requirements, that accurately certifies compliance with such requirements, and that contains a compliance plan for all applicable requirements for which it is

not in compliance constitutes a violation of Section 503(c) of the CAA and the regulations at 40 C.F.R. §§ 70.5(a), 70.5(c), and 70.7(b). BP Products also failed to supplement its permit application in violation of 40 C.F.R. § 70.5(b).

182. BP Products' operation of the Whiting Facility and FCU 500 without an appropriate Title V operating permit issued by IDEM constitutes a violation of sections 502(a), 503(c), and 504(a) of the CAA, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), and of 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b).

183. As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, BP Products is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009, and up to $37,500 per day for each violation that occurred after January 12, 2009.

## TWELFTH CLAIM FOR RELIEF

### (EPCRA - Failure to Report Releases in Excess of RQs)

184. The allegations in paragraphs 1 through 86 are hereby re-alleged and incorporated by reference as if fully set forth herein.

185. At all times relevant herein, the Whiting Refinery has been a "facility" within the meaning of Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 372.3.

186. At all times relevant herein, BP Products has manufactured toxic chemicals and other hazardous and extremely hazardous substances at the Whiting Refinery within the meaning

of Section 313(b)(1)(c) of EPCRA, 42 U.S.C. § 11023(b)(1)(c), and 40 C.F.R. § 372.3, including $H_2S$.

187.    Upon information and belief, on multiple occasions between July 13, 2004 and June 1, 2007, BP Products failed to immediately notify the applicable SERC (State Authority) and LEPC (Local Authority) of releases of $H_2S$ from the sulfur pits at the Whiting Refinery's Sulfur Recovery Unit that were equal to, or greater than, the RQ for $H_2S$ as required by Section 304(a) of EPCRA, 42 U.S.C. § 11004(a).

188.    Upon information and belief, on multiple occasions between July 13, 2004 and June 1, 2007, BP Products failed to provide a written follow-up emergency notice to the applicable SERC (State Authority) and LEPC (Local Authority) as soon as practicable after the releases of $H_2S$ described in the preceding paragraph which require notice under Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), in accordance with the requirements of Section 304(c) of EPCRA, 42 U.S.C. § 11004(c).

189.    Upon information and belief, the acts or omissions referred to in the preceding paragraphs constitute violations of Section 304 of EPCRA, 42 U.S.C. § 11004.

190.    As a result of its violations, pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and 40 C.F.R. 19.4, BP Products is liable for civil penalties in an amount of up to $27,500 per day for each such violation occurring between January 30, 1997 and March 30, 2004, and up to $82,500 per day for each day that any second or subsequent violation continues. BP Products is liable for civil penalties in an amount of up to $32,500 per day for each such violation occurring between March 30, 2004 and January 12, 2009, and up to $97,500 per day for each day that any second or subsequent violation continues.  BP Products is liable for civil

penalties in an amount of up to $37,500 per day for each such violation occurring after January 12, 2009, and up to $107,500 per day for each day that any second or subsequent violation continues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court:

1.      Order BP Products to immediately comply with the statutory and regulatory requirements cited in this Complaint under the Clean Air Act and EPCRA;

2.      Order BP Products to take appropriate measures to mitigate the effects of their violations;

3.      Award the United States civil penalties of up to $27,500 per day for each of BP Products' violations occurring on or before March 15, 2004, up to $32,500 per day for each violation occurring between March 16, 2004 and January 11, 2009, and up to $37,500 per day for each violation occurring after January 11, 2009;

4.      Award the United States its costs and expenses incurred in this action; and

5.      Grant such other and further relief as may be just and proper and as the public interest and the equities of the case may require.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division


*Susan Akers / by Drafur, Ms A*
SUSAN M. AKERS
Senior Attorney

39

STEVEN D. SHERMER
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4831
(202) 616-6584 (Fax)
Susan.Akers@usdoj.gov
Steven.Shermer@usdoj.gov

WAYNE T. AULT
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320
Telephone: 219-937-5500
Telecopy: 219-852-2770
Wayne.Ault@usdoj.gov

Attorneys for the United States

OF COUNSEL:

WILLIAM WAGNER
MARY McAULIFFE
Associate Regional Counsels
United States Environmental Protection Agency
Region 5
Chicago, Illinois 60604