## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF INDIANA, <br><br> *Plaintiffs*, <br><br> and <br><br> THE NATURAL RESOURCES DEFENSE COUNCIL, HOOSIER ENVIRONMENTAL COUNCIL, SIERRA CLUB, SAVE THE DUNES, SUSAN ELEUTERIO, and TOM TSOURLIS, <br><br> *Plaintiff-Intervenors*, <br><br> v. <br><br> BP PRODUCTS NORTH AMERICA INC., <br><br> *Defendant*. | Civil No. 2:12 CV 207 <br><br> Judge Philip P. Simon <br><br> Magistrate Judge Andrew Rodovich |

## MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENORS' MOTION TO ENFORCE CONSENT DECREE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

    **I.**   Jurisdiction ........................................................................................................ 3

    **II.**  Statutory and Regulatory Background ...................................................... 4

    **III.** Factual Background .................................................................................... 4

         **A.**  PM Pollution from FCU 500 and FCU 600 ........................................ 4

         **B.**  Events Leading Up to the November 6, 2012 Consent Decree ........... 6

         **C.**  The Consent Decree's PM Limits and Related Requirements ........... 6

         **D.**  Defendant's Alleged Violations of the Consent Decree and Activity Leading Up to This Motion ........................................................................... 9

STANDARD OF REVIEW .............................................................................................. 11

ARGUMENT ................................................................................................................... 12

    **I.**   BP Violated the Consent Decree's PM Limits at FCU 500 and FCU 600. .............. 12

         **A.**  Non-sulfate PM Violation at FCU 600 (2016) ................................... 12

         **B.**  $PM_{10}$ Violations at FCU 500 (2017) ...................................... 12

         **C.**  Non-sulfate PM Violations at FCU 500 (2018) .................................. 13

    **II.**  The Violations Continued Each Day until BP Successfully Demonstrated Compliance with the Applicable Limits. .................................................. 13

    **III.** Circumstantial Evidence Indicates BP's Performance Tests May Not Accurately Reflect Parameter Levels for Periods of Operation between Tests, and that BP May Not Be Able to Demonstrate "Continuous Compliance" at Those Levels...... 14

         **A.**  Evidence Suggests BP's Performance Tests Are Conducted at ESP Power Levels Much Higher than the Average ESP Power Levels Used during Periods of Operation between Performance Tests ........................................... 15

         **B.**  Average Baseline ESP Power Levels Have Rapidly Increased Over the Last Three Years, Suggesting That BP is Not Attempting to "Target" the Average ESP Levels for Preceding Periods between Performance Tests ...................... 17

         **C.**  Other Testing Irregularities Suggest BP May Not Be Able to Demonstrate Continuous Compliance for Periods of Operation between Performance Tests 18

    **IV.** Supplementary Relief is Necessary to Ensure BP is in Compliance with the Consent Decree and CAA and to Effectuate the Consent Decree's Clear Purpose. 19

**A.** **The Court Should Declare that BP Has Violated its PM Limits, and Order BP to Determine the Root Cause of the Violations and to Take Appropriate Action to Prevent Recurrence and Assure Continuous Compliance with the Limits** .................................................................................................................. **20**

**B.** **The Court Should Order BP to Demonstrate Its Compliance with the Required Operating Parameters of ¶ 21(a)(iv) of the Consent Decree with Respect to Past Performance Tests** ........................................................................ **21**

**C.** **The Court Should Order BP to Demonstrate How it has "Targeted" Average ESP Power Levels in Accordance with ¶ 21(a)(iv)(4) in Past Performance Tests 23**

**D.** **The Court Should Order BP to Demonstrate Compliance with the Required Operating Parameters of ¶ 21(a)(iv) on a Prospective Basis** ............................ **23**

**CONCLUSION AND REQUESTED RELIEF** .......................................................................... **24**

# TABLE OF AUTHORITIES

## Cases

*All. to End Repression v. City of Chicago*,
742 F.2d 1007 (7th Cir. 1984) ................................................. 11

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ...................................................... 11, 23

*Marlowe v. Bottarelli*,
938 F.2d 807 (7th Cir. 1991) .............................................. 11, 23

*McCall-Bey v. Franzen*,
777 F.2d 1178 (7th Cir. 1985) ................................................ 3

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
478 U.S. 546 (1986), *supplemented*, 483 U.S. 711 (1987) ...................... 22

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*,
525 F.3d 533 (7th Cir. 2008) ................................................ 11

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ........................................................ 11

*United States v. ITT Continental Baking Co.*,
420 U.S. 223 (1975) ........................................................ 11

*White v. Roughton*,
689 F.2d 118 (7th Cir.1982) ............................................. 11, 20

## Federal Statutes

42 U.S.C. § 7401(b) .......................................................... 4

42 U.S.C. § 7413 ............................................................ 13

42 U.S.C. § 7602(k) ....................................................... 4, 13

42 U.S.C. § 7604 ............................................................ 10

## Federal Regulations

40 C.F.R. § 60.104a .......................................................... 8

40 C.F.R. § 60.105a ........................................................................................................... 9, 16, 21

40 C.F.R. § 60.108a ........................................................................................................... 9, 16, 21

40 C.F.R. § 60.7 ...................................................................................................................... 9, 16

40 C.F.R. § 60.8 .......................................................................................................................... 13

## State Regulations

326 IAC 3-6-3 ................................................................................................................................ 19

## INTRODUCTION

Plaintiff-Intervenors Environmental Integrity Project, Sierra Club, Natural Resources Defense Council, and Environmental Law and Policy Center (collectively, "Plaintiff-Intervenors"), parties to the Consent Decree in this matter entered on November 6, 2012 (the "Consent Decree") [ECF No. 10], concerning Defendant BP Products North America Inc.'s ("BP" or "Defendant") Whiting, Indiana oil refinery ("Whiting Refinery"), respectfully move to enforce BP's obligations under the Consent Decree.

Plaintiff-Intervenors seek an order requiring Defendant to demonstrate compliance with the Consent Decree in light of multiple failed PM performance tests,[1] and evidence that BP's performance tests may not be adhering to the testing parameters required to demonstrate "continuous compliance" with the Consent Decree and the Clean Air Act ("CAA"). Parties further seek relief from the Court to ensure that these limits are fully enforced on a prospective basis by ensuring that the testing parameters are adhered to, steps are taken to prevent recurrence of the violations, and critical information concerning PM emissions performance testing is made available to all parties to the Consent Decree so as to ensure continuing enforceability.

Plaintiff-Intervenors' Motion is proper because the Consent Decree, which was negotiated to resolve CAA violations alleged by Plaintiff-Intervenors, the U.S. Environmental Protection Agency ("EPA"), and the Indiana Department of Environmental Management ("IDEM") in 2012, is still in effect today and this Court has retained jurisdiction over it. Consent Decree at ¶ 169. The Consent Decree also grants Plaintiff-Intervenors the right to "seek to enforce the obligations of BP under this Decree… by filing with the Court a motion for appropriate relief." *Id.* at ¶ 198(d).

The Consent Decree requires BP to comply with numeric limitations on the emissions of

---

[1] "Performance test" and "stack test" are identical in meaning, and the terms are used interchangeably throughout the Consent Decree, the Clean Air Act, and regulations or guidance implementing the Clean Air Act.

various types of soot pollution, known as particulate matter ("PM"), from Whiting Refinery's fluidized catalytic cracking units 500 and 600 ("FCU 500" and "FCU 600"). The FCUs are central components of a recent expansion of the Whiting Refinery which allowed it to process heavy crude from the Canadian tar sands, a subject of the litigation underlying the Consent Decree.

In order to ensure compliance with these limits, the Consent Decree requires that BP conduct annual performance testing at the FCU smokestacks and report the results of those tests to Plaintiff-Intervenors and EPA. The Consent Decree further requires that certain key operating parameters for pollution control equipment during each test – including most notably primary power levels at the PM-collecting electrostatic precipitators ("ESPs") – be consistent with average levels for the operating period since the previous performance test. This is in order to ensure that the tests reflect actual parameters during typical periods of operation, and not periodic snapshots of more robust operation of pollution controls above those levels. Consent Decree at ¶ 21(a)(iv)(4).

As discussed in more detail below in the Background section of this Memorandum, BP was out of compliance with these limits for the following periods of time:

- *Non-sulfate particulate matter (PM)*:  The Consent Decree limits emissions to 1.0 pounds of non-sulfate PM per 1000 pounds of coke[2] burned at both FCU 500 and 600. Based upon the results of BP's performance tests, that limit was exceeded at FCU 600 for 34 days in 2016, and at FCU 500 for 229 days in 2018.

- *Fine particulate matter (PM10)*:  The Consent Decree limits emissions of fine particulate matter measuring 10 microns or less ("PM10"), which are considered especially dangerous to human health, to 0.9 pounds per 1000 pounds of coke burned at FCU 500.  Based upon the results of BP's performance tests, that limit was exceeded

---

[2] As discussed *infra*, petroleum coke is a by-product of the oil refining process, combustion of which produces PM pollution.

at FCU 500 for 140 days in 2017.

In addition, available information in the performance test reports shows that ESP power levels during such tests have increased by roughly 51% over the course of three years. As explained further below, there is reasonable evidence that BP may have violated the Consent Decree's performance testing parameters. However, Plaintiff-Intervenors do not have access to the information concerning ESP power levels between performance tests necessary to determine BP's compliance or non-compliance with those parameters. It also does not appear, based on file review and information provided by BP prior to the filing of this motion, that BP has taken any action necessary to prevent a recurrence of the violations, such as root cause analyses of the violations.

Accordingly, Plaintiff-Intervenors respectfully seek the following relief from the Court, as defined more fully below:

1) A declaration that BP violated the Consent Decree for the periods specified;

2) A requirement that BP provide documentation necessary to demonstrate its compliance with the required performance testing parameters, including ESP power levels, both with respect to past testing and on a prospective basis; and

3) A requirement that BP take steps to understand the past violations and prevent future violations by conducting root cause analyses of the identified violations.

## BACKGROUND

## I.      Jurisdiction

District courts have the inherent authority to enforce consent decrees over which they have explicitly retained jurisdiction. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1190 (7th Cir. 1985). The Consent Decree provides that "[t]his Court will retain jurisdiction of this matter for the purposes of implementing and enforcing the terms of the Consent Decree… until the Consent Decree terminates in accordance with Part XVII of this Consent Decree." Consent Decree at ¶ 169. The

Consent Decree is still in effect, and Plaintiff-Intervenors are all parties to the 2012 Consent Decree who are authorized by its terms to "seek to enforce the obligations of BP under this Decree… by filing with the Court a motion for appropriate relief." *Id*. at ¶ 198(d).

## II.    Statutory and Regulatory Background

The CAA was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b). To achieve this goal, the CAA prohibits sources from emitting pollutants in excess of their "emissions limitations," defined as any "requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction[.]" 42 U.S.C. § 7602(k).

EPA's longstanding interpretation of the CAA, expressed repeatedly throughout decades of rulemaking and policy statements, is that in order for a source to demonstrate "continuous compliance" with an emissions limit, "any stack [performance] test that is conducted… must demonstrate that a facility is capable of complying with the applicable emissions standards *at all times*" (emphasis added). U.S. EPA, Clean Air Act National Stack Testing Guidance (April 27, 2009) (excerpted), Ex. 1 at 5; *see also* U.S. EPA, Guidance re: Definition of "Continuous Compliance" and Enforcement of O&M Violations (June 24, 1982) ("sources are required to meet, without interruption, all applicable emissions limitations and other control requirements[.]").

## III.    Factual Background

### A.    PM Pollution from FCU 500 and FCU 600

FCU 500 and FCU 600 are fluidized catalytic cracking units at the Whiting Refinery, constructed in 1945 and 1946 respectively. Cracking units are designed to convert, or "crack," certain crude oil hydrocarbons into lighter products such as, *e.g.,* gasoline, using a catalyst

4

typically consisting of zeolite and earth metals. The cracking process involves mixing gas oils and catalyst stream at elevated temperatures in a fluidized bed reactor, a process which generates and coats the catalyst in sulfur-contaminated "petroleum coke" (the solid black by-product of the cracking process, visually resembling coal chunks or powder). The coke is then burned off in a regenerator, which recovers the catalyst for reuse and results in the emission of various types of PM pollution, including non-sulfate PM (or "filterable" PM) and PM measuring less than 10 microns in diameter ("$PM_{10}$"). Human exposure to PM has well-documented links to serious health risks, such as decreased lung function, a wide array of respiratory issues, heart attacks and irregular heartbeat, aggravated asthma, and premature death in individuals with heart or lung disease.[3]

FCU 500 and FCU 600's PM emissions are controlled by an ESP, which removes particles from a gas exhaust stream by electrically charging the particles and then attracting the charged particles to metal plates having the opposite charge. The ESP's power levels need to be high enough to supply the electrical current needed to capture and remove particulates to the point where the concentrations remaining in exhaust gas are low enough to meet applicable emission limits. *See* U.S. EPA, CAM Technical Guidance Document – A.25 Electrostatic Precipitator (ESP) For PM Control (June 2002) (excerpted), Ex. 2. (EPA guidance on ESP performance noting that "ESP performance improves as total power input increases."). EPA and IDEM guidance documents both state that tests must be conducted under representative operating conditions for pollution control equipment. Ex. 1 at 15; Indiana Department of Environmental Management, Stack

---

[3] U.S. Environmental Protection Agency. "Health and Environmental Effects of Particulate Matter (PM)." https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm *archived at* https://perma.cc/4JHQ-6B4E. Individuals with heart or lung diseases, children, and older adults are particularly vulnerable to and most likely to be affected by PM exposure. The size of the particles is directly related to their potential for causing health problems, and fine particles less than 10 micrometers in diameter like $PM_{10}$ pose the greatest risks due to their ability to penetrate deep into the lungs and enter the bloodstream. *Id.* 100% of FCU 500's total $PM_{10}$ emissions consist of $PM_{2.5}$ (174.3 tons out of 174.3 tons per year), the finest particles with the greatest health risks, while roughly 71% (46.6 tons out of 65.4) of FCU 600's $PM_{10}$ emissions consist of $PM_{2.5}$. *See* IDEM, Technical Support Document for Significant Permit Modification No. 089-38851-00453 (July 31, 2017) at page 20.

Test Guide (last revised August 1, 2018) (excerpted), Ex. 3 at 16-17.

**B.     Events Leading Up to the November 6, 2012 Consent Decree**

In May 2008, Plaintiff-Intervenors brought claims in state administrative litigation and in a Petition for Review under the CAA alleging that certain permits allowing BP to make changes to FCU 500 and FCU 600, in connection with the expansion of the Whiting Refinery allowing it to process crude oil from the Canadian tar sands, violated the CAA. These administrative claims included, *inter alia,* claims regarding PM emissions from the FCUs. At roughly the same time as Plaintiff-Intervenors' challenges, from 2007-2008, EPA issued several notices of violation ("NOVs") to BP concerning numerous alleged violations of federal environmental laws, including the CAA, at the Whiting Refinery. Prior to the final resolution of Plaintiff-Intervenors' claims and the NOVs, the parties reached a settlement which is embodied in the Consent Decree.

After the parties reached settlement, on May 23, 2012, the U.S. Department of Justice ("U.S. DOJ"), acting at the request and on behalf of EPA, filed a Complaint against BP for alleged environmental violations at its Whiting Refinery. EPA was joined by the State of Indiana alleging violations of its applicable State Implementation Plan ("SIP") and other state rules, regulations, and permits implementing the requirements of the CAA, as well as numerous citizen-intervenors (including all Plaintiff-Intervenors here) seeking to resolve their claims regarding permits issued to BP by IDEM. At the same time as its suit was filed, EPA lodged the Consent Decree with this Court in the form of a proposed final judgment. On November 6, 2012, this Court issued its final judgment accepting and entering the Consent Decree as an order of the Court.

**C.     The Consent Decree's PM Limits and Related Requirements**

Under the Consent Decree, BP "committed to undertake an extensive set of projects at the Whiting Refinery (i) to assure present and future compliance with the Clean Air Act, and regulations and permits issued thereunder and (ii) to substantially reduce emissions of pollutants

6

from the Whiting Refinery." Consent Decree at 3. As this Court noted in its November 6, 2012 order, the "comprehensive array of injunctive relief required by the decree," which included the non-sulfate PM and $PM_{10}$ limits, was expressly intended to "address the fundamental causes of BP Products' alleged violations" and "prevent similar non-compliance at the Whiting Refinery in the future." November 6, 2012 Order at 6, [ECF No. 9 at 6].

BP committed to limiting its non-sulfate PM to 1.0 pounds per 1000 pounds of coke burned at FCU 500 and 600, Consent Decree at ¶ 17, and $PM_{10}$ to 0.9 pounds per 1000 pounds of coke burned at FCU 500. *Id.* at ¶ 18. The Consent Decree requires BP to conduct performance tests at the FCU smokestacks to demonstrate compliance with these PM limits. *Id.* at ¶¶ 17, 20. It also sets forth specific requirements for performance tests, which includes defining both the frequency of the performance tests and the manner in which tests are to be conducted. *Id.* at ¶¶ 17, 21. It further states that compliance "shall be based on the emission rate computed from the most recent performance test completed pursuant" to these requirements. *Id.* at ¶¶ 20-21.[4]

The Consent Decree requires that BP observe the following parameters during the required PM performance tests to ensure that FCU emissions are measured under conditions reflecting typical operating conditions:

(1) Coke burn rate for all test runs is not less than actual average coke burn rate over the time period since the previous test; *Id.* at ¶ 21(a)(iv)(1).

(2) Average $SO_2$ concentration for all test runs is not greater than 10 ppmvd @ 0% O2; *Id.* at ¶ 21(a)(iv)(2).

---

[4] Federal regulation and guidance, which govern performance test requirements under 40 C.F.R. Part 60, Subpart Ja, similarly state that on a failed stack test, "violations should be assumed to be continuous from the first provable date of violation until the source demonstrates compliance." *See* U.S. EPA, Clean Air Act Stationary Source Civil Penalty Policy (October 25, 1991) (excerpted), Ex. 4 at 11-12; *see also* 42 U.S.C. § 7413(e).

(3) Average ammonia injection rate for all test runs is not less than average total ammonia injection rate over the time period since the previous test; *Id*. at ¶ 21(a)(iv)(3).

(4) BP target the average ESP total primary power level recorded over the time period since the last performance test, and in no case exceed 120% of average ESP total primary power level since the last performance test. *Id*. at ¶ 21(a)(iv)(4).

In particular, the requirement that BP "target" ESP power levels during each performance test to the average level recorded for the time period since the previous test ensures that test operators do not artificially increase power to the ESPs during a test so as to increase Defendant's chances of "passing" (*i.e.*, holding PM emissions under the required limits). The Consent Decree allows for some variation to accommodate unexpected circumstances beyond the operator's control that may arise during testing, so long as ESP primary power during the test does not exceed 120% of the average operating level since the last test. The Consent Decree requires that BP maintain records concerning certain operating parameters that were extant during periods in between performance tests in order to demonstrate its compliance with the Consent Decree. *Id*. at ¶ 163 (BP must maintain all records "required by this Consent Decree or deemed necessary by EPA or IDEM to verify compliance with this Consent Decree."). It is silent, however, as to requirements for disclosure of this information to the parties and the Court.

Under the Consent Decree, FCU 500 and FCU 600 are subject to 40 C.F.R. Part 60, Subpart Ja's specific requirements for demonstrating compliance with the non-sulfate PM limit, which include a requirement that all performance tests consist of a minimum of three valid, one-hour test runs.  *Id*. at ¶ 17; 40 C.F.R. § 60.104a(d)(4)(i). Subpart Ja requires owners or operators of FCUs with an ESP to operate "continuous parameter monitor systems" that measure, record, and maintain hourly averages for certain parameters, including ESP primary and secondary power

levels and coke burn-off rates, for all hours of FCU operation. 40 C.F.R. § 60.105a(b). Operators must maintain these measurements, as well as any other information required by Subpart Ja, "in a permanent form suitable for inspection." 40 C.F.R. § 60.7(f); 40 C.F.R. § 60.108a.

### D. Defendant's Alleged Violations of the Consent Decree and Activity Leading Up to This Motion

From 2016 to 2018, pursuant to the Consent Decree, BP reported performance test results to Plaintiff-Intervenors and EPA. Those performance test results showed several exceedances of the Consent Decree PM limits at FCU 500 and FCU 600:

- BP's May 25, 2016 performance test showed that FCU 600 averaged a non-sulfate PM emission rate of 1.072 pounds per 1000 pounds of coke burned, exceeding the Consent Decree's limit of 1.0 pounds per 1000 pounds of coke burned. *See* FCU 600 Subpart Ja Compliance Test (May 25, 2016) (excerpted), Ex. 5 at Table 1-1. Based on these results, IDEM determined FCU 600 was out of compliance with its non-sulfate PM limit beginning on May 25, 2016. *See* Office Memorandum re: BP Products North America from Kale Popp, IDEM Office of Air Quality, to Rick Massoels, Deputy Director of the Northwest Regional Office (July 28, 2016), Ex. 6.

- BP's May 11, 2017 performance test showed that FCU 500 averaged a $PM_{10}$ emission rate of 1.198 pounds per 1000 pounds of coke burned, exceeding the Consent Decree's limit of 0.9 pounds per 1000 pounds of coke burned. *See* FCU 500 Consent Decree Compliance Emission Test (May 11, 2017) (excerpted), Ex. 7 at Table 1-1. Based on these results, IDEM determined FCU 500 was out of compliance with its $PM_{10}$ limit beginning on May 11, 2017. *See* Office Memorandum re: BP Whiting from Andrea James, IDEM Office of Air Quality, to Rick Massoels, Deputy Director of the Northwest Regional Office (October 3, 2017), Ex. 8.

- BP's April 19, 2018 performance test showed that FCU 500 averaged a non-sulfate PM emission rate of 1.326 pounds per 1000 pounds of coke burned, exceeding the Consent Decree's limit of 1.0 pounds per 1000 pounds of coke burned. *See* FCU 500 Subpart Ja Compliance Test (April 19, 2018) (excerpted), Ex. 9 at Table 1-1. Based on these results, IDEM determined that FCU 500 was out of compliance with its non-sulfate PM limit beginning on April 19, 2018. *See* Office Memorandum re: BP Whiting from Jarrod C. Fisher, IDEM Office of Air Quality, to Rick Massoels, Deputy Director of the Northwest Regional Office (December 11, 2018), Ex. 10.

Plaintiff-Intervenors contacted BP on two occasions prior to filing this Motion, once via email on September 12, 2018, and again via a Notice of Intent ("NOI") letter informing BP of Plaintiff-Intervenors' intent to either file a motion seeking enforcement of the Consent Decree or to sue for violations of the same requirements, which are incorporated into BP's Title V permit, pursuant to the CAA citizen suit provision, 42 U.S.C. § 7604.[5] *See* Plaintiff-Intervenors' Notice of Intent to Sue (November 13, 2018), Ex. 11. BP's response outlined no steps taken at the Whiting Refinery to prevent future violations, but asserted that the test conducted on April 19, 2018 did not actually reflect an exceedance, because one of the three test runs was an outlier that should be discarded. *See* BP's Response to Notice of Intent (December 14, 2018), Ex. 12. Plaintiff-Intervenors responded that the Consent Decree and Subpart Ja plainly require that compliance be determined using a minimum of three valid test runs, and that failure to do so is itself a violation of both. *See* Plaintiff-Intervenors' Reply to BP's Response Letter (January 17, 2019), Ex. 13.

---

[5] Plaintiff-Intervenors are not required by the Consent Decree to provide BP with any notice prior to moving to enforce its terms. However, U.S. DOJ informed Plaintiff-Intervenors shortly after their initial communication attempt on September 12 that BP intended to seek termination of the Consent Decree over the Government's objection. Plaintiff-Intervenors thus concluded an NOI was necessary in order to preserve their claims under the CAA, in the event that the Consent Decree was terminated before the underlying violations were addressed.

Plaintiff-Intervenors also noted that IDEM had declined to discard the third test run in question, and concluded that FCU 500 was "out of compliance" on April 19, 2018. *Id*. Plaintiff-Intervenors' January 17 letter also identified the non-sulfate PM exceedance at FCU 600 on May 25, 2016.

## STANDARD OF REVIEW

A consent decree "is to be construed… basically as a contract." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238 (1975). To prevail, a plaintiff need only prove its claim by a preponderance of evidence. *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 538 (7th Cir. 2008). As with any contract, "the scope of a consent decree must be discerned within its four corners," *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971), and both the Supreme Court and Seventh Circuit have made clear that "[t]he relevant 'four corners' are those of the decree, not of one provision of the decree." *All. to End Repression v. City of Chicago*, 742 F.2d 1007, 1011 (7th Cir. 1984) (quoting *White v. Roughton,* 689 F.2d 118, 119 (7th Cir.1982)); *see also Cont'l Baking*, 420 U.S. at 238 (holding reliance on relevant contextual "aids to construction… does not in any way depart from the 'four corners' rule.").

Thus, in interpreting a clause, its "language must be read in context" and a court must not read it "in isolation from the rest of the paragraph and the rest of the decree" or "without reference to the decree's evident purpose." *White*, 689 F.2d at 119. As a general rule, when the decree as a whole "is unambiguous, its plain language controls." *Marlowe v. Bottarelli*, 938 F.2d 807, 812 (7th Cir. 1991). However, because "the overriding purpose in construing a contract" is to effectuate "the purposes embodied in the instrument," *White*, 689 F.2d at 119, "where literal application of a text would… thwart the obvious intentions of its drafters, 'those intentions must be controlling.'" *Marlowe*, 938 F.2d at 812 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)); *see also White*, 689 F.2d at 120 ("language which is otherwise explicit may be read with a modification needed to make it consistent with [the consent decree's] purpose."). The standard for

11

interpreting purpose and intent is also preponderance of evidence, and a court may weigh any relevant credible evidence in doing so. *See generally All. to End Repression*, 742 F.2d at 1011-1013 (weighing persuasive merits of several items of extrinsic evidence regarding decree's intent).

## ARGUMENT

As set forth below, BP's performance tests demonstrate that BP violated the Consent Decree's various PM limits. In addition, available evidence indicates that BP may not be adhering to the Consent Decree requirements concerning performance testing parameters.

## I.    BP Violated the Consent Decree's PM Limits at FCU 500 and FCU 600.

The Consent Decree mandates that performance tests, which must adhere to certain requirements concerning test parameters, shall be used to determine compliance with the PM limits at FCU 500 and FCU 600, and that compliance "shall be based on the emission rate computed from the most recent performance test completed pursuant" to these requirements. Consent Decree at ¶¶ 20-21. As discussed above in Section III.D of the Background section, the results of BP's performance tests are facially clear violations of the Consent Decree, and IDEM has determined that BP was out of compliance with its applicable PM limits beginning on those dates.

### A.    Non-sulfate PM Violation at FCU 600 (2016)

BP's performance tests show that FCU 600 exceeded its limit for non-sulfate PM on May 25, 2016. *See supra* § III.D, Ex. 5 at Table 1-1. IDEM has determined that FCU 600 was out of compliance with the non-sulfate PM limit beginning on May 25, 2016. Ex. 6.

### B.    $PM_{10}$ Violations at FCU 500 (2017)

BP's performance tests show that FCU 500 exceeded its limit for $PM_{10}$ on May 11, 2017. *See supra* § III.D; Ex. 7 at Table 1-1. IDEM has determined that FCU 500 was out of compliance with its $PM_{10}$ limit beginning on May 11, 2017. Ex. 8. Defendant's December 14, 2018 letter conceded that it failed its May 11, 2017 $PM_{10}$ stack test at FCU 500 and does not contest these

results demonstrate its noncompliance. Ex. 12 at 4.

### C. Non-sulfate PM Violations at FCU 500 (2018)

BP's performance tests show that FCU 500 exceeded its limit for non-sulfate PM on April 19, 2018. *See supra* § III.D; Ex. 9 at Table 1-1. While BP's response to the Notice of Intent claims that this is not a violation because the third test run must be excluded from compliance determination, Ex. 12 at 2-3, the Consent Decree and Subpart Ja expressly require that all performance tests consist of a minimum of three valid, one-hour test runs. 40 C.F.R. § 60.8(a); Consent Decree at ¶ 17. Thus, even if BP is correct in arguing that the third test run was invalid, BP has still failed to comply with Subpart Ja's requirement of three valid test runs or to demonstrate compliance with the non-sulfate PM limit. BP did not conduct another valid test run to replace the third test run, and IDEM has determined that FCU 500 was out of compliance with its non-sulfate PM limit beginning on April 19, 2018. Ex. 10.

## II. The Violations Continued Each Day until BP Successfully Demonstrated Compliance with the Applicable Limits.

As discussed above, "the CAA requires continuous compliance with emissions limits[.]" Ex. 1 at 14 (citing 42 U.S.C. § 7602(k)). To ensure that all sources comply with these limits "without interruption," the CAA authorizes penalties for multiple days of continuing violations, and establishes a presumption that violations are continuous until the source proves that it is in compliance. *Id.* (citing 42 U.S.C. § 7413(e)). Consequently, on a failed stack test, "violations should be assumed to be continuous from the first provable date of violation until the source demonstrates compliance." Ex. 4 at 11-12 (citing 42 U.S.C. § 7413(e)). These long-standing principles are explicitly incorporated in ¶ 20(a) of the Consent Decree, which states that compliance with its PM limits "shall be based on the emission rate computed from the most recent performance test completed pursuant" to the Consent Decree's requirements. In other words, when

13

a performance test demonstrates that BP is in violation of a limit, BP remains in violation of that limit until the next valid performance test which successfully demonstrates compliance.

Thus, BP was in violation of the non-sulfate PM limit at FCU 600 beginning on May 25, 2016, and remained in violation for a total of 34 days until June 28, 2016, when BP's performance test measured an average non-sulfate PM emission rate of 0.398 pounds per 1000 pounds of coke burned. *See* FCU 600 Subpart Ja Compliance Test (June 28, 2016) (excerpted), Ex. 14 at Table 1-1. BP was in violation of the $PM_{10}$ limit at FCU 500 beginning on May 11, 2017, and remained in violation for a total of 140 days until September 28, 2017, when BP's performance test measured an average $PM_{10}$ emission rate of 0.421 pounds per 1000 pounds of coke burned. *See* FCU 500 Consent Decree Compliance Test (September 28, 2017) (excerpted), Ex. 15 at Table 1-1. BP was in violation of the non-sulfate PM limit at FCU 500 beginning on April 19, 2018, and remained in violation for a total of 229 days until December 4, 2018, when BP's performance test measured an average non-sulfate PM emission rate of 0.254 pounds per 1000 pounds of coke burned. *See* FCU 500 Subpart Ja Compliance Test (December 4, 2018) (excerpted), Ex. 16 at Table 1-2.

### III. Circumstantial Evidence Indicates BP's Performance Tests May Not Accurately Reflect Parameter Levels for Periods of Operation between Tests, and that BP May Not Be Able to Demonstrate "Continuous Compliance" at Those Levels.

The Consent Decree's specific requirements for targeted performance testing parameters embody the CAA's requirement of "continuous compliance," and are intended to ensure that BP's periodic performance tests accurately reflect emissions under actual levels of plant operation at FCU 500 and FCU 600 – not just emissions for a few hours per year. Consent Decree at ¶ 21; *see also* Ex. 1 at 14 ("any stack test … must demonstrate that a facility is capable of complying with the applicable emissions standards *at all times*" (emphasis added)). In particular, as discussed above, the Consent Decree sets forth certain parameters for performance tests to ensure that they accurately reflect emissions for periods of operation between tests – including, among others, a

requirement that ESP power levels not be increased during tests to levels significantly above the average levels during the preceding period, so as to artificially enhance their PM collection abilities.

The limited evidence currently available to Plaintiff-Intervenors and EPA concerning BP's performance tests, discussed in the sections below, indicates that BP may not be complying with the Consent Decree's required performance test parameter concerning ESP power levels, such that those tests do not accurately reflect actual parameter levels used during periods between performance tests at FCU 500 and FCU 600. This evidence suggests that BP may not be able to demonstrate continuous compliance with its PM limits at the average parameter levels for periods of operation between tests. Because the failure to demonstrate compliance with an emissions limitation at *all times* is a violation of the requirements of both the Consent Decree and the CAA, additional information is necessary to assure BP's compliance with the Consent Decree and CAA.

### A. Evidence Suggests BP's Performance Tests Are Conducted at ESP Power Levels Much Higher than the Average ESP Power Levels Used during Periods of Operation between Performance Tests

As set forth above, the Consent Decree specifically requires that BP "***shall target*** the average ESP total primary power since the last stack [performance] test" for all performance tests and that the average ESP total primary power for all performance test runs is no greater than 120% of average ESP total primary power since the last performance test. Consent Decree at ¶ 21(a)(iv)(4) (emphasis added).   Thus, it is clear that BP is required to "target" – that is, aim for – holding ESP power levels to the actual levels used during the preceding period between performance tests. The 120% limit is framed as a backstop – that is, if the efforts during a test to target the average ESP power levels for the preceding period between tests fail to achieve those levels, then at the very least the ESP power level must not be greater than 120% of those average operating levels. This requirement reflects the understanding that PM emissions are generally expected to fall as ESP power levels increase, and is intended to ensure that PM emissions recorded during performance

15

tests reflect PM emissions at typical ESP power levels during periods of actual plant operation.

Plaintiff-Intervenors currently lack information concerning ESP operating levels during periods between performance tests. The Consent Decree requires BP to maintain that information in order to demonstrate its compliance with its ESP requirements and the CAA. *See id.* at ¶ 163 (BP must maintain all records "required by this Consent Decree or deemed necessary by EPA or IDEM to verify compliance with this Consent Decree."). Subpart Ja similarly requires owners or operators of FCUs with an ESP to operate "continuous parameter monitor systems" that measure, record, and maintain hourly averages for certain parameters, including ESP primary and secondary power levels and coke burn-off rates, for all hours of FCU operation, as well as any other information required by Subpart Ja, "in a permanent form suitable for inspection." 40 C.F.R. § 60.7(f); 40 C.F.R. §§ 60.105a(b), 60.108a. However, the Consent Decree silent regarding the provision of this data to the parties and the Court.

The information available to Plaintiff-Intervenors nonetheless suggests that BP is not able to meet its PM limits at parameter levels used during periods between tests, because it barely meets those limits when ESP power skates close to the 120% backstop maximum. For example, the ESP primary power level during the November 17, 2015 test was 18% higher than the average power levels over the six months since the previous test on May 21. *See* Office Memorandum re: BP Whiting from Luke Boyer, IDEM Office of Air Quality, to Rick Massoels, Deputy Director of Northwest Regional Office (February 4, 2016), Ex. 17. Yet the November 17 test results reported a $PM_{10}$ concentration of 0.806 pounds per 1000 pounds of coke burned – or 90% of the 0.9 pound per 1000 pound limit – despite the much higher ESP power levels. This data indicates it is likely BP would have failed the November test had it been conducted at the lower ESP power levels that more accurately represent the average rates preceding the test, as intended by ¶ 21.

16

The Consent Decree assumes that BP will ensure ESP power levels during performance tests remain consistent with average levels for the period preceding the test, and allows levels up to 20% higher only as a backstop for unforeseen circumstances that arise during testing and which are beyond the operator's control. Consent Decree at ¶ 21(a)(iv)(4). The clear purpose of the 120% backstop allowance is to ensure that tests reflect as accurately as possible the unit's performance at typical operating parameters, *not* to allow BP to ramp up ESP voltage to 120% of prior averages during testing for the sole purpose of demonstrating compliance, and then to significantly reduce ESP power levels for periods between tests. The fact that the PM limit was barely met even when ESP power levels were significantly higher than prior operating averages indicates that compliance with PM limits at the lower ESP power levels used outside of testing may not be possible.

**B.      Average Baseline ESP Power Levels Have Rapidly Increased Over the Last Three Years, Suggesting That BP is Not Attempting to "Target" the Average ESP Levels for Preceding Periods between Performance Tests**

Although Plaintiff-Intervenors do not have the data maintained by BP concerning ESP power levels during periods between performance tests, the available data on ESP power levels during performance tests indicates that the average ESP primary power level during tests for $PM_{10}$ has increased dramatically over the past three years – representing a 51% overall increase from May 2015 to April 2018, and a 30% increase from May 2017 to September 2017 alone. This consistent increase over the past three years indicates that BP may not be making efforts to ensure that its performance tests accurately "target" average ESP levels for preceding periods of operation between tests, as required by ¶ 21(a)(iv)(4) of the Consent Decree.

**Figure 1** below shows the average $PM_{10}$, ESP primary power levels, and coke burn rates for each FCU 500 performance test since May 2015. The red text indicates a failure of the $PM_{10}$ limit, and the date corresponds to the date of the last performance test run (as some performance tests are conducted over more than one day):

17

**Figure 1: Average PM$_{10}$ emission rates and ESP primary power levels.**

| Date | PM$_{10}$ | ESP Power Level (kW) | Coke Burn Rate (lb/hr) |
|---|---|---|---|
| 4/23/2018[6] | 0.788 | 178 | 47,344 |
| 9/28/2017[7] | 0.421 | 177 | 47,628 |
| 5/11/2017[8] | 1.198 | 136 | 50,669 |
| 8/18/2016[9] | 0.528 | 119 | 54,357 |
| 4/15/2016[10] | 0.696 | 111 | 54,839 |
| 11/17/2015[11] | 0.806 | 118 | 55,926 |
| 5/21/2015[12] | 0.835 | 118 | 50,468 |

The significant increase in ESP power level during the September 28, 2017 performance test, which followed BP's failed performance test on May 11, 2017, raises significant questions as to whether the higher ESP power rates are, in fact, representative of the power rates used during periods of typical operation between tests, or instead reflect attempts to maximize performance during test periods. The rapid increase in baseline ESP power levels over the past three years is particularly concerning because, as the coke burn rates demonstrate, the higher baseline ESP power rates cannot be attributed to a higher utilization rate of the ESP (and in fact, coke burn rates have decreased even as ESP power levels have increased). Neither Plaintiff-Intervenors nor this Court, however, currently have access to the maintained data regarding ESP levels for periods of operation between performance tests that is necessary to make this determination.

### C.   Other Testing Irregularities Suggest BP May Not Be Able to Demonstrate Continuous Compliance for Periods of Operation between Performance Tests

There is at least one other instance of testing irregularities occurring when BP has approached the allowable maximum of its applicable PM limitations, again raising legitimate

---

[6] FCU 500 Consent Decree Compliance Emission Test (April 23, 2018) (excerpted), Ex. 18 at Table 1-1, Table 3-1.
[7] Ex. 15 at Table 1-1, Table 3-1.
[8] Ex. 7 at Table 1-1, Table 3-1.
[9] FCU 500 Consent Decree Compliance Emission Test (Aug. 18, 2016) (excerpted), Ex. 19 at Table 1-1, Table 3-1.
[10] FCU 500 Consent Decree Compliance Emission Test (April 15, 2016) (excerpted), Ex. 20 at Table 1-1, Table 3-1.
[11] FCU 500 Consent Decree Compliance Emission Test (Nov. 17, 2015) (excerpted), Ex. 21 at Table 1-1, Table 3-1.
[12] FCU 500 Consent Decree Compliance Emission Test (May 21, 2015) (excerpted), Ex. 22 at Table 1-1, Table 3-1.

concerns as to whether BP can successfully demonstrate "continuous compliance" for all periods of operation between tests at FCU 500 and FCU 600, as required by the Consent Decree and CAA.

Applicable law and guidance requires that testing be conducted continually and without stoppage, except in fairly narrowly defined circumstances. Indiana's SIP requires that all test runs for performance tests be completed within a 48-hour period, and that even where process variables or mandatory test lengths of greater than two hours make this impracticable, testing must at a minimum be conducted on consecutive days. *See* 326 IAC 3-6-3(b)(2).[13] Yet BP's April 23, 2018 performance report shows that BP began test runs on April 20, 2018 – but stopped at 5:08 p.m. after the second test run (Test Run No. 2-500) showed an average $PM_{10}$ emission rate of 0.899 pound per 1000 pounds of coke burned – within *0.1%* of exceeding its 0.9 pounds per 1000 pounds of coke burn limit. *See* Ex. 18 at Table 1-1. Performance testing did not resume until 9:30 AM on April 23, *64 hours later*, with the third and fourth test runs demonstrating much lower $PM_{10}$ emission levels. *Id.* BP's performance test report provides no explanation for its failure to conduct the April 23, 2018 performance test either within a 48-hour period or on consecutive days – both of which are requirements of Indiana's SIP. 326 IAC 3-6-3(b)(2).[14]

## IV.    Supplementary Relief is Necessary to Ensure BP is in Compliance with the Consent Decree and CAA and to Effectuate the Consent Decree's Clear Purpose.

As demonstrated above, BP has exceeded its PM limits on multiple occasions, in clear

---

[13] EPA's 2009 Stack Test Guidance states that once a test being conducted to demonstrate compliance has started, stoppage is only appropriate under certain circumstances, and "[d]epending on the circumstances surrounding the stoppage, the facility may be found in violation of the requirement to conduct a stack test, the underlying regulatory requirement, or both." Ex. 1 at 17. In particular, the Guidance states that if it appears that "a facility stopped the stack test because it was exceeding applicable emission standards and would have failed the test, it would be considered in violation of both the requirement to conduct a stack test (if it does not complete a performance test by the applicable deadline) and to comply with the underlying regulatory requirement or permit condition. Consistent with 40 CFR §§ 60.11 and 61.12, any credible evidence may be used to demonstrate non-compliance." *Id.*

[14] BP's April 23, 2018 report does not acknowledge or provide any explanation for this 64-hour delay separating the first two and latter two test runs. BP is clearly aware of the 48-hour requirement for stack testing because in the only other stack test displaying a similarly lengthy gap – August 18, 2016 – BP specifically noted the 43-hour gap between Test Runs No. 1-500 and 3-500 and justified it as resulting from an electrical/CEMS malfunction. *See* Ex. 19 at page 4-1 (noting that Test Run No. 2-500 was voided due to an electrical/CEMS malfunction).

violation of ¶¶ 17 and 18 of the Consent Decree. Furthermore, evidence from BP's performance tests indicate that (1) BP's performance tests may not accurately reflect emissions for periods of operation between tests, (2) BP is not making any efforts to ensure that its tests accurately reflect average parameters for periods of operation between tests, and (3) BP may not be able to demonstrate "continuous compliance" with its PM limits at the average parameter levels for such periods of operation. However, while BP is required to maintain records of its operating conditions between performance tests in order to demonstrate its compliance with the Consent Decree's requirements, Plaintiff-Intervenors and the Court currently have no access to that information.

The "overriding purpose" in construing a consent decree is to effectuate "the purposes embodied in the instrument," and even provisions with "language which is otherwise explicit may be read with a modification needed to make it consistent with [this] purpose." *White*, 689 F.2d at 119-120. The supplementary injunctive relief requested by Plaintiff-Intervenors is necessary and appropriate (1) to ensure that BP is in compliance with the terms of the Consent Decree and CAA, (2) to maintain this Court's power to implement and enforce the Consent Decree, and (3) to effectuate the clear purposes of both the Consent Decree and CAA that a "stack [performance] test… must demonstrate that a facility is capable of complying with the applicable emissions standards *at all times*" (emphasis added). Ex. 1 at 14.

### A. The Court Should Declare that BP Has Violated its PM Limits, and Order BP to Determine the Root Cause of the Violations and to Take Appropriate Action to Prevent Recurrence and Assure Continuous Compliance with the Limits

As demonstrated above, the Court should declare that BP violated the Consent Decree's non-sulfate PM limit at FCU 600 for 34 days from May 25, 2016 to June 28, 2016, $PM_{10}$ limit at FCU 500 for 140 days from May 11, 2017 to September 28, 2017, and non-sulfate PM limit at FCU 500 for 229 days from April 19, 2018 to December 4, 2018.

The express purpose of the Consent Decree, as this Court stated when entering it, is to

"address the fundamental causes of BP Products' alleged violations" and "prevent similar non-compliance at the Whiting Refinery in the future." November 6, 2012 Order [ECF 9] at 6. Furthermore, the Consent Decree requires BP both to "assure present and future compliance" with any applicable limits and "to substantially reduce emissions of pollutants from the Whiting Refinery." Consent Decree at 3. Accordingly, this Court should further order Defendant to, within 90 days of the Court's ordering such relief, evaluate the root cause of these violations, identify remedial actions necessary to ensure compliance with the PM limits on a prospective basis, and provide the results of said analyses to all parties and the Court.

**B.     The Court Should Order BP to Demonstrate Its Compliance with the Required Operating Parameters of ¶ 21(a)(iv) of the Consent Decree with Respect to Past Performance Tests**

As demonstrated above, BP may not be complying with Consent Decree's performance testing parameters at FCU 500 and FCU 600, and this Court should order BP to demonstrate its compliance with the requirements of ¶ 21(a)(iv) by providing Plaintiff-Intervenors, EPA, IDEM, and this Court with all documentation of the hourly or daily average ESP primary power levels, coke burn rates, $SO_2$ concentrations, and ammonia injection rates for all hours of operation at FCU 500 and FCU 600 from January 1, 2015 to present.

Any performance test "must demonstrate that a facility is capable of complying with the applicable emissions standards *at all times*" (emphasis added). Ex. 1 at 14. It is for this reason that BP is required by both the Consent Decree and applicable federal law to monitor, record, and maintain either hourly or daily data regarding testing parameters at FCU 500 and FCU 600 for all periods of operation – including periods between performance tests – for the specific purpose of demonstrating that it can comply with the limits at *all* times of plant operation. *See* Consent Decree at ¶¶ 19, 97, and 101; 40 C.F.R. §§ 60.105a(b)(1)(i) and 60.108a(c)(4)).

The Consent Decree provides that this Court will retain jurisdiction "for the purposes of

implementing and enforcing the terms of the Consent Decree… until the Consent Decree terminates in accordance with Part XVII of this Consent Decree." Consent Decree at ¶ 169. It also authorizes Plaintiff-Intervenors to enforce its terms. *Id.* at ¶ 198(d). However, without access to BP's records concerning operating parameters, it is not practically possible for either Plaintiff-Intervenors or the Court to determine whether the Consent Decree's PM limits – and associated testing parameters – are actually being complied with, or that BP is, in fact, capable of *continuous* compliance with its limits as required by the Consent Decree and CAA. Thus, it is both appropriate and necessary that this Court order BP to demonstrate its continuous compliance by providing to Plaintiff-Intervenors the information concerning average ESP power levels for periods of operation between performance tests that it has maintained for the purposes of demonstrating compliance with ¶ 21(a)(iv)(4), pertinent to all performance tests conducted since 2015. *Id.* at ¶ 163.

Though the Consent Decree as written does not expressly require BP to do so, it clearly recognizes that access to the retained information is essential to enforcement. *Id*. at ¶ 163 (granting EPA and IDEM right of entry "for the purpose of monitoring compliance with the provisions of this Consent Decree, including… inspecting all records maintained by the Whiting Refinery required by this Consent Decree or deemed necessary by EPA or IDEM to verify compliance with this Consent Decree."). While the Consent Decree provides the governmental parties with access to the necessary enforcement information, it is a fundamental underpinning of the CAA enforcement scheme that private citizens may step into the shoes of the government as enforcing parties, in order to ensure robust enforcement of the Act. 42 U.S.C. ¶ 7604; *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986), *supplemented,* 483 U.S. 711 (1987) (Congress enacted ¶ 7604 "specifically to encourage citizen participation in the enforcement of [the CAA]," and intended to grant citizens "very broad opportunities to participate

in the effort to prevent and abate air pollution" (internal quotes omitted)). An interpretation of the Consent Decree that would effectively prevent Plaintiff-Intervenors and this Court from meaningfully enforcing its terms would frustrate the clear purposes of the Consent Decree and CAA. *Marlowe*, 938 F.2d at 812 (where "literal application of a text would… thwart the obvious intentions of its drafters, 'those intentions must be controlling.'" (quoting *Griffin,* 458 U.S. at 571)).

### C.    The Court Should Order BP to Demonstrate How it has "Targeted" Average ESP Power Levels in Accordance with ¶ 21(a)(iv)(4) in Past Performance Tests

As discussed above, during performance tests BP is required by the Consent Decree to "target" average ESP power levels for the period since the last performance test. Consent Decree at ¶ 21(a)(iv)(4). To the extent it deviates from that targeted average, the Consent Decree provides a backstop maximum of 120% of such levels. As discussed above, available evidence suggests that BP, in its performance tests, may be routinely ratcheting up ESP power to close to 120% of average operating levels, hence violating the requirement that it "target" those levels. Accordingly, this Court should order BP to demonstrate the measures it took in performance tests conducted since 2015 to comply with the ¶ 21(a)(iv) requirement that it target average ESP power levels.

### D.    The Court Should Order BP to Demonstrate Compliance with the Required Operating Parameters of ¶ 21(a)(iv) on a Prospective Basis

For the same reasons as described in Sections III.B and C above, this Court should further order BP to provide the information described in those sections on a prospective basis, until the termination of the Decree. That is, the Court should order BP to make available to Plaintiff-Intervenors the information concerning testing parameters maintained pursuant to Consent Decree ¶ 163, if a request is made within 60 days of their receipt of any future performance test reports provided pursuant to Consent Decree ¶¶ 98 and 101. Additionally, upon request within 60 days, BP should be required to report upon the steps it has taken to target average ESP power levels since the prior test pursuant to ¶ 21(a)(iv). The availability of this information on a prospective

basis is necessary for Plaintiff-Intervenors and this Court to conduct future oversight and enforcement of the Consent Decree and to ensure that BP's performance tests demonstrate that BP is capable of "continuous compliance" with the emissions limitations.

## CONCLUSION AND REQUESTED RELIEF

For all the foregoing, Plaintiff-Intervenors respectfully request that this Court:

1. Declare that BP violated:

   a. The non-sulfate PM limit for FCU 600 for a total of 34 days from May 25, 2016 to June 28, 2016;

   b. The $PM_{10}$ limit for FCU 500 for a total of 140 days from May 11, 2017 to September 28, 2017; and

   c. The non-sulfate PM limit for FCU 500 for a total of 229 days from April 19, 2018 to December 4, 2018;

2. Order BP to evaluate the root causes of its failures to meet the applicable PM emission limitations on May 25, 2016 at FCU 600, May 11, 2017 at FCU 500, and April 19, 2018 at FCU 500; to identify actions necessary to ensure compliance with these limits on a prospective basis; and to provide the resulting information to Plaintiff-Intervenors, EPA, and IDEM;

3. Order BP to demonstrate its compliance with the Consent Decree's required testing parameters of ¶ 21(a)(iv) by providing Plaintiff-Intervenors with all records of the actual hourly or daily average ESP primary power levels, coke burn rates, $SO_2$ concentrations, and ammonia injection rates for all hours of operation at FCU 500 and FCU 600 from January 1, 2015 to present;

4. Order BP to demonstrate its efforts during each stack test at FCU 500 and FCU 600 after January 1, 2015 to target ESP power levels at the average levels for the period since the previous stack test, as required by ¶ 21(a)(iv)(4) of the Consent Decree;

5. Ensure the Court's ability to conduct continuing oversight and enforcement of the Consent

24

Decree pursuant to ¶ 169 by ordering BP to make information regarding testing parameters and all efforts to target average ESP power levels, as required by ¶ 21(a)(iv), available upon request to Plaintiff-Intervenors within 60 days of their receipt of any future performance test reports provided pursuant to Consent Decree ¶¶ 98 and 101;

6.  Award any further relief the court deems appropriate or necessary.

Dated: February 4, 2019                   Respectfully submitted,

                                          /s/ Sanghyun Lee
                                          Sanghyun Lee
                                          Eric V. Schaeffer
                                          Environmental Integrity Project
                                          1000 Vermont Ave., Suite 1100
                                          Washington, DC 20005
                                          (202) 263-4440
                                          SLee@environmentalintegrity.org
                                          ESchaeffer@environmentalintegrity.org

                                          *Counsel for Plaintiff-Intervenors Environmental Integrity Project and Sierra Club*

                                          /s/ Jeffrey Hammons
                                          Jeffrey Hammons
                                          Environmental Law & Policy Center
                                          1440 G Street NW
                                          Washington, DC 20005
                                          (785) 217-5722
                                          JHammons@elpc.org

                                          *Counsel for Plaintiff-Intervenor Environmental Law & Policy Center*

                                          /s/ Ann Alexander
                                          Ann Alexander
                                          Natural Resources Defense Council
                                          111 Sutter St. 21st Floor
                                          San Fransisco, CA 94105
                                          (415) 875-6190
                                          AAlexander@nrdc.org

                                          *Counsel for Plaintiff-Intervenor Natural Resources Defense Council*

25